————o————

GEORGE C. MILLER, Respondent, *vs.* JOHN A. DUNN, *et al.*, Appellants.

1. *Limitations—State statute no bar prior to issue of U. S. patent.*—Under the decision of Gibson vs. Chouteau (13 Wal., 92) possession for the period named in the State statute of limitations is no bar until the legal title passes out of the United States. (McElhinney vs. Ficke, 61 Mo., 329.)

PER HOUGH, J.

2. *Adverse possession—Right of, simply an equity—Effect of, when so pleaded.*—The right of adverse occupancy in such case was simply an equity, and if properly pleaded would bar a recovery.

ON MOTION FOR REHEARING.

3. *Spanish and territorial law—Ante-nuptial contract—Spanish law of "arras" —Common law.*—A conveyance of land in the territory of Louisiana, made in 1808, by an American inhabitant, in contemplation of marriage, which deed in no wise conformed to the Spanish or civil law, and contained nothing in its terms to indicate a reference to the Spanish law of *arras*, would be held to be governed by the common law, or at least so much of it as had, by positive statutes, been introduced into the territory; and, accordingly, by the statute of descents and distributions, would not be held as conveying only one-tenth part of the donor's property.

4. *New Madrid certificate—Head-right confirmation—Location of—Minutes of old board and recorder Bates—Place of record prima facie proof of location, etc., etc.*—Suit involving the title to land obtained under a new Madrid certificate developed the facts that an original application, made in 1806, to the first board of commissioners, for a head or settlement right, merely bounded the land by natural objects, and it was shown to adjoin a confirmation proved to be for land which was in the district of New Madrid in 1804. The minutes of the old board and of recorder Bates showed that the head-right confirmation was in Cape Girardeau. But a subsequent deed made in 1808, conveying the same grant, was recorded in New Madrid, and by the law then in force it could only be recorded in the district where the land was situated; and the deed itself recited that both parties resided in Cape Girardeau. The New Madrid certificate was issued for the same tract. The territorial sub-division into districts in 1804 and 1808 was not shown in evidence. *Held,* that *prima facie* the record of the deed in New Madrid districts showed that in 1808 the land was embraced therein, and this conclusion was greatly strengthened

by the recital showing that while both parties resided in Cape Girardeau, they proceeded to New Madrid to procure its record ; that as the New Madrid certificate could not issue for land in Cape Girardeau, the minutes of the board and of the commissioner, locating the land in Cape Girardeau, should be held to be a mistake, and that it devolved on the party so claiming to prove *aliunde*, that in point of fact the district of New Madrid did not in 1808 embrace the tract.

### *Appeal from St. Louis Circuit Court.*

*Glover & Shepley,* for Appellants, cited Terr. Laws, p. 13, § 16; Beaume vs. Chambers, 22 Mo., 53; Youse vs. Norcum, 12 Mo., 558; Cutter vs. Waddingham, 23 Mo., 252; 1 White Recop., 58 ; Schmidt's Civ. Law, pp. 88–9, 256; Lesner vs. Price, 12 How., 73, 74, 79 ; Wear vs. Hickman, 5 Mo., 147 ; Joeckli vs. Easton, 11 Mo., 124 ; Cabanne vs. Lindell, 12 Mo., 184; Gray vs. Gibens, 26 Mo., 291.)

*D. T. Jewett,* for Respondent, cited Reddick vs. Walsh, 15 Mo., 534; Terr. Laws, 125–187; Landes vs. Brant, 10 How., 372 ; French vs. Spencer, 21 How., 239 ; Hooper vs. Schoerner, 23 How., 255; Fenn vs. Holme, 21 How., 481 ; Gibson vs. Chouteau, 39 Mo., 569, 570 ; S. C., 50 Mo., 85, and 13 Wal., 92; McElhinney v. Ficke, 61 Mo., 329 ; Wagn. Stat., 559, 560, §§ 11, 12.

NAPTON, Judge, delivered the opinion of the court.

This is an action of ejectment to recover a tract of land included in United States Survey 2,541, which was made under New Madrid certificate No. 164, in the name of John Brooks or his legal representatives.

The record of the trial shows that both parties claim under Charles Lucas, who bought of Brooks in 1807.

Charles Lucas, on December 4, 1808, by a marriage contract with Sarah Graham, conveyed this property to her in contemplation of marriage, which was recorded April 29, 1809. During the marriage Charles Lucas conveyed this property to one Tanner, and from Tanner the title passed through various persons to defendant. After the death of Lucas, his wife conveyed the same property to one Gillespie, and the plaintiff possesses the title so acquired.

On the trial the plaintiff had judgment.

There seems to be only two questions involved in this case. First, as to the validity and effect of this marriage settlement on Sarah Graham and her conveyance after the death of her husband ; and, second, as to the statute of limitations.   There is no dispute as to the possession of defendants claiming under Charles Lucas for more than twenty years before suit, but as the legal title never passed from the United States until the act of congress of 1864, our State statute of limitations was no bar under the decision of the Supreme Court of the United States in Chouteau vs. Gibson.   For that cause was, as this is, a New Madrid location, and we are unable to distinguish the one from the other; and therefore, although entertaining the same opinion as the counsel for the defendant in regard to the effect of that decision, as overturning and destroying many *bona fide* possessions, acquired and retained on the faith of our State laws and State decisions under these laws, we have no alternative but to pursue the same course taken in the case of McElhinney vs. Ficke (61 Mo., 329).

We shall, therefore, dismiss from our consideration all questions arising under the statute of limitations, and the question of title alone remains.   And it is clear that the relative value of the titles of plaintiff and defendant depends entirely upon the validity and effect of the marriage settlement from Charles Lucas to his intended wife in 1808.   It is objected that this deed is not proved.   It purports to have been sealed and delivered in the presence of Edward M. Mathews, Jr., and Robert Trotter, and acknowledged before Stephen Ross, a justice of the peace in the district of New Madrid, territory of Louisiana, and is found duly recorded in the clerk's office of what is now New Madrid county.   The only objection is that it transfers lands in the district of Cape Girardeau as well as in New Madrid, and that the land in lieu of which New Madrid certificate No. 164 was issued, was in the district of Cape Girardeau, as appeared from the claim of John Brooks before the first board of commissioners, and by the report of recorder Bates.   It is obvious, however, that a New Madrid certificate could not issue for land in Cape Gir-

ardeau, and the mistake must have originated in recorder Bates, and not in the deed of Lucas. No objection is made to the proof of the deed.

This deed obviously conveyed to Sarah Graham the land in controversy on the event of her marriage with Charles Lucas, or rather it conveyed the land in New Madrid, which is the basis of the location under the act of congress of 1815, and which location covered the land in controversy.

It is urged that this conveyance must be regarded as made under the Spanish law, and that under that law a man could not convey to his intended wife more than one-tenth of his property by way of arras or donation on account of marriage; and this seems to be the correct construction of the Spanish law. (White Recop., vol. 1, p. 56 and note.)

In White's N. Recopilacion the word *arras* is translated into jointure, as conveying nearly the same meaning, and the writer defines arras as "a dowry assigned to or settled upon the wife by her husband for her maintenance after his death, which cannot exceed in value or amount the tenth part of his fortune or property," and the right of the wife to arras is likened to her right to dower under the common law.

Whatever may be the true construction of the Spanish law concerning "arras" or "dote," its counterpart, it is clear that this conveyance, although made in 1808, and before our statute had introduced the common law, was made or supposed to be made in conformity to the common law—since it did not conform to any provisions of the Spanish law.

The arras and dote of the laws of Spain were simply regulations fixing the interest of the wife in the husband's property and the interest of the husband in his wife's property, and then the same law determined what was *ganancial* property, and regulated the rights of the husband, the wife and the children.

The peculiar condition of this territory, from 1804 up to 1816, has been the subject of frequent remark in our court, and the occasion of adjudications growing out of this anomalous condition. The American population, that came here

upon the acquisition of Louisiana from France, very soon exceeded in number the old settlers. They of course knew nothing of the laws of Spain or the civil law, and made their contracts in view of the laws with which they were familiar, whilst the old inhabitants of French origin were still in many instances acting in conformity to the civil law with which they were alone conversant. It will be seen by an examination of the decisions of this court, that it has been the object of our courts to give effect to the intent of the parties to a contract, so far as the law existing at the time would allow, whether made with a view to the Spanish law or to the common law, both systems prevailing to some extent previously to 1816. (Lindell vs. McNair, 4 Mo., 380; Picott vs. Cooley, 10 Mo., 312; Youse vs. Norcum, 12 Mo., 553; Cutter vs. Waddingham, 22 Mo., 252; Beaume vs. Chambers, 22 Mo., 53.)

It will be observed that before the marriage of Charles Lucas to Sarah Graham, and before the deed from Lucas to his intended wife, there were several territorial statutes, all manifestly the work of legislators conversant with the common law, and all regulating the subjects legislated on with reference only to that system of law, and some of these statutes, passed as they were before the introduction of the common law generally by the act of 1816, were still totally inconsistent with the civil law, or Spanish law, or the custom of Paris, which had previously prevailed in the territory. Take for instance, the act concerning marriages, passed 24th April, 1805; a second act, on the same subject, passed July 2, 1806 (Edwards Terr. L., p. 83); the act concerning divorce and alimony, passed March 13, 1807 (Terr. L., p. 90); the act concerning wills, descent and distribution, passed July 4, 1807 (T. L., p. 125); the act concerning recorders and dower, passed July 7, 1807 (T. L., p. 178); an act concerning the dower of widows and marriage contracts, passed June 18, 1808—all of which were totally inconsistent with, and of course so far repealed the Spanish law on these subjects. The act concerning descent and distribution and wills, espe-

cially, cannot be reconciled with the arras and dote of the Spanish law, or with the rules of succession or privilege of making wills, as recognized by the Spanish law.

These acts were all passed prior to the marriage of Lucas, and prior to his deed to Sarah Graham. The objections to this deed, based upon the Spanish law of arras, and the rights of the wife and children under that law, seem hardly applicable. Besides, the deed itself is plainly a mere common law conveyance from Lucas to his intended wife, in consideration of marriage. There is nothing in its terms to justify the least suspicion that it had any reference to the Spanish law of arras—nothing to show that the property conveyed constituted the one-tenth of the whole, or any other proportion of the grantor's estate. Considering, then, the territorial laws to which we have referred, and which were in force at the date of this deed and prior to the marriage, which took place shortly after the deed, and looking at the deed itself it is difficult to see how any other conclusion can be reached, than that this conveyance, and the marriage which followed it, and the rights of the husband and wife, and of the children of the marriage, must all be governed by the common law, or at least so much of it as had been, by positive statutes, introduced into the territory; and the statutes in regard to dower and regulating descents manifestly abolish the Spanish or civil law on these subjects.

This view of the case disposes of all the points made by the counsel for defendants based on the Spanish law.

The deed of Mrs. Lucas to Gillespie according to the common law conveyed the title. The deed of Lucas to Tanner, during the marriage, conveyed only a life estate. It is hardly necessary to state that the marriage was clearly proved, and the death of Lucas before his wife's deed in 1821 to Gillespie. These facts were submitted to the jury, and there was ample evidence to sustain their verdict.

The main defense was the statute of limitations, which, as has been already stated, was in our opinion a valid and sufficient one. The Supreme Court of the United States claim

the right to review the decisions of this court on that subject, and have the power to enforce that claim. It would therefore profit neither party for this court to disregard their decision.

The judgment is therefore affirmed. Judge Vories absent; the other judges concur.

### PER HOUGH, J.

I concur in affirming the judgment, but do not think the statute of limitations, as pleaded, constituted any defense. The right acquired by adverse occupancy was simply an equity, and if it had been properly pleaded as such, it would, in my judgment, have barred a recovery by the plaintiff.

### ON MOTION FOR REHEARING.

The motion for rehearing in this case is based on alleged mistake in the opinion of the court, in assuming that the land conveyed in the deed of Brooks to Lucas, in 1808, was in point of fact in the district of New Madrid, and that the minutes of the old Board of Commissioners, and of Mr. Bates, the recorder, in describing the land as in the district of Cape Girardeau, was a mistake. It is argued, that although in 1815, when the recorder issued his certificate under the law of that year, concerning lands injured by earthquakes, the land was unquestionably in New Madrid county, it may have been in 1808 within the limits of the district of Cape Girardeau, and therefore should have been recorded in that district.

The only proof to show, that the land was in the district of Cape Girardeau, is found in the action of the commissioners and of the recorder, in which the land is described as in the district of Cape Girardeau, and it is possible that the land might have been in that district in 1808, and yet in the county of New Madrid in 1815.

Upon examination of the acts of congress in relation to what was called in 1804 the District of Louisiana, we find, that by the act of March 26th, 1804, this district was directed to be divided by the Governor, under the direction of the

Miller v. Dunn, et al.

President, into districts, subject to such alterations as experience might suggest to be advisable. At that date the Governor and judges of the Territory of Louisiana constituted the executive, legislative and judicial functionaries of the territory. Subsequently, in 1805, a governor and judges for this territory were appointed, constituting what has been termed the second grade of territorial government. In 1812 the third grade of territorial government was reached, in which a council was created and a legislative assembly authorized to be elected. The 7th section of this last act of June 4th, 1812, authorized the governor to lay off the territory into convenient counties before the first Monday in October following, and appoint the places of holding elections.

In December 31st, 1813, the General Assembly of the Territory enacted a law, establishing counties and county lines, probably conforming to those fixed by the governor before October, 1812.

It is admitted that Brooks' headright was, in 1812 or 1813, in what then constituted the county of New Madrid.

The lines of this district, established by the governor in 1804, under the 13th section of the act of Congress of March 26th, 1804, and from that time down to the establishment of counties, in 1812 or 1813, do not appear from any act of Congress, or from any legislative enactment of the territory.

By the act of Congress of March 26th, 1804, and the act of the governor and judges concerning recorders, passed on 1st of October, 1804, it appears that such districts had been established, but their exact boundaries could only appear from the records of the executive, which were not produced in the trial.

The defendant insists, that before the deed from Brooks to Lucas could have been admitted, it devolved on the plaintiff to show that the land conveyed was in the district of New Madrid, where it was recorded.

To show that the land did not in 1808 lie in the district of New Madrid, but was in the district of Cape Girardeau, the reliance is placed entirely on the minutes of the commissioners

who confirmed this land to Brooks, and the subsequent minutes of recorder Bates, who extended the grant from 250 acres to 709 acres in 1814 or 1815.

It was of no importance to the board of commissioners in 1807, whether the land was in the one district or the other.

The confirmation was upon a survey which described the land by metes and bounds of natural objects. We find that Mr. Bates, when granting an extension of the confirmation from 250 to 709 acres, under the act of July, 1814, still describes the land as in Cape Girardeau district, although no such district existed at that date.

The deed from Brooks to Lucas in 1808 is very strong proof to show that the land conveyed was in the district of New Madrid.

It appears from the recitals in the deed or agreement, that both Brooks and Lucas resided in the district of Cape Girardeau, and that Brooks had lived on it in 1806, yet they proceeded to New Madrid district, selected a justice of the peace of that district to take the acknowledgment, and had the deed recorded in New Madrid. This would seem to be unaccountable except on the hypothesis that the land was in that district. It would certainly be most remarkable that the grantor and grantee, both living in Cape Girardeau district, and, of course, both knowing the locality of the land, should have gone out of their district to get a deed acknowledged and recorded for land that was in the district of their residence. This, however, would be a mere presumption of fact based on the ordinary conduct of men in certain circumstances.

The fact, that Brooks lived in Cape Girardeau, to some extent accounts for the minutes of the commissioners in locating his land in that district.

But it will be seen that Brooks, in his application to the board, does not locate the land in the district of Cape Girardeau. He describes the land as in Tywappity bottom, and presents to the board a survey made by Soulard, which bounds the land by natural objects, and represents it as bounded on the northeast by John N. Shun's land. Now, Shun's confirma-

tion, which is found among the confirmations of the local board, is for land proved to have been in the district of New Madrid, in 1804. It is, of course, possible that the Spanish districts in 1804 did not correspond with the districts as laid out by the American governor, and besides the confirmation of Shun's land was read in evidence on the trial.

The question could, of course, be settled by showing the actual boundaries of the district in 1808. The governor laid out these districts to meet the convenience of the then inhabitants, selecting five principal points in the territory as the central points of the districts: St. Charles, St. Louis, St. Geneveive, Cape Girardeau and New Madrid. The record of the division and of the boundaries may yet be procured, but it was not produced on the trial.

The 12th section of the act of March 26th, 1804, made it the duty of the secretary of the Louisiana territory to record and preserve all the papers and proceedings of the governor of an executive nature, relative to the district of Louisiana, and transmit authentic copies thereof every six months to the President of the United States. If this law was complied with, the division of this territory into districts, and the boundaries of the districts, must be preserved at Washington.

*Prima facie* the record in New Madrid shows the land to have been in that district. Neither the deed of Brooks to Lucas, nor of Lucas to Sarah Graham described the land conveyed as in the district of Cape Girardeau. Both deeds were recorded in the district of New Madrid. *Prima facie* they were recorded in the district where the land was, and where, by law, they only could have been properly recorded. The presumption of law is, that public officers do their duty, and the recorder of New Madrid is entitled to the benefit of this presumption. To rebut this presumption, it devolved on the defendant to show that the land was not in the district where it was recorded. The evidence from all the documents submitted, we think now, as we thought before on a more hasty examination, preponderated decidedly to the conclusion

15—VOL. LXII.

that the Brooks headright was in New Madrid district in 1808, as it was undoubtedly in the county in 1812–13–14 and 1815. The question might have been settled by the production of the governor's subdivision of the territory in 1804, but this was not done, nor was any instruction asked on this point.

The motion for a rehearing is therefore overruled. The other judges concur, except Judge Vories, who is absent.