HAMMOND et al., Appellants, v. JOHNSTON, Receiver, et al.

1. **Sheriff's Deed:** CERTIFIED COPY OF ORIGINAL: EVIDENCE. Under Revised Statutes, section 2395, a copy of a sheriff's deed, certified by the recorder, is admissible in evidence without proof of loss or inability to produce the original deed.

2. **Equitable Interest in Real Estate:** EXECUTION. Under 1 Territorial Laws, page 120, section 45, an equitable interest in real estate could be sold under execution.

3. **Title to Land:** RELATION. The doctrine of relation, although a fiction of the law, will be resorted to in the acquisition of title to land when the ends of justice require it. It will be applied as between the person acquiring the title to land by successive acts and those who acquire an interest from or under him.

4. **Sheriff's Deed:** DESCRIPTION OF PREMISES. However vague the description of the land in a sheriff's deed may be, parol evidence is admissible to identify the premises, and to show that in the community where the sale took place the land was known by the description given.

5. ——— : ———. The description in the sheriff's deed in question in this case, and the evidence relating to the same, examined, and the description held sufficient.

6. **United States Patent, When Complete.** When a patent to land from the United States is made out, signed by the president, sealed with the seal of the general land office, and recorded in the record books kept for that purpose, it needs no further authentication or delivery to give it effect.

Hammond v. Johnston.

7. ——: LIMITATION. The statute of limitations will begin to run from the date of the issuance of such patent, and not from the time of the delivery to the grantee.

8. **Statute of Limitation:** CIVIL WAR. During the late civil war, the statute of limitations was suspended, as to residents of the state of Tennessee, from April 19, 1861, to April 2, 1866.

9. ——: PATENT: ADVERSE POSSESSION. The statute of limitation leaves the right of entry under a legal title, subsequently acquired by a patent from the United States, wholly unaffected by any previous adverse possession; and the statute, for this reason, cannot operate as a transfer of the equitable right to the land to such adverse occupant.

10. **Defaced Deed;** PRESUMPTION: EVIDENCE. Where deeds are los ʰ, and their records defaced, so that parts of the acknowledgment cannot be understood, it will be presumed that the parts defaced were formal. But no such presumption is necessary, or to be allowed, where a certified copy is before the court as original evidence.

*Appeal from St. Louis City Circuit Court.*—HON. W. H. HORNER, Judge.

AFFIRMED.

*D. T. Jewett* with whom was *Henry H. Denison* for appellants.

(1) The claim of Joseph Hunot was properly, in due time, filed before the board of commissioners, created by the act of March 2, 1805 (vol. 2, p. 325), as appears by the record of said board. The several acts of congress under which this board acted allowed a claim to be filed at any time before the first day of July, 1808, and the record shows that the board took testimony on this claim the twentieth day of June, 1808. 2 U. S. Stats. p. 441, sec. 5; Act of Congress, March 3, 1807. (2) After said claim was filed, the deed of Joseph Hunot to Joseph Vandenbenden, in 1810, conveyed an equity in said land to the grantee, and warranted the title against all persons claiming under him. *Landes v. Brant,* 10 How.

(U. S.) 372; *Callahan v. Davis*, 90 Mo. 83. (3) This claim, rejected by the old board under the act of 1805, was again referred, by the acts of thirteenth of June, 1812, and March 3, 1813, to recorder Bates. The first and second sections of the act of 1813 (2 U. S. Stat., p. 812), are doubtless the ones giving him power over this claim. The law did not require any new filing of the claims before Bates. He took them as he found them filed before the old board, and acted upon them in the name of the person who appeared, by those records, to be the owner. Bates had nothing to do with transfers made after the filing of the papers before the old board, and never took any notice of them, but confirmed them according to the ownership, as it there appeared. And that confirmation enured to the owner of the land, viz., Vandenbenden. *Landes v. Brant*, 10 How. 374; *Callahan v. Davis*, 90 Mo. 83. (4) Joseph Vandenbenden was the owner of the New Madrid land when the New Madrid act was passed, February 17, 1815 (3 U. S. Stats., p. 211), and was thus the person entitled to the relief under said law. *McCamant v. Patterson*, 39 Mo. 100. (5) The return of survey number 2500, though not made till June, 1819, was good to vest the equitable title in Easton, or his legal representatives, at the time the return was made, and not before. *Chouteau v. Gibson*, 39 Mo. 560; *Hammond v. Coleman*, 4 Mo. App. 307. (6) The equitable title, therefore, vested in Easton, or his representatives, in February, 1833, and not before, and, by virtue of his full warranty deed to Hammond, the title passed *instanter* to Hammond. *Vide* Statutes of 1825, p. 217, sec. 6, which is merely declaratory of the common law. (7) Easton's deed to Hammond, dated September 29, 1823, has in it two clerical errors. The first one, where he says he conveys to Hammond "two hundred and forty acres of land, and all the following tract, except two hundred and thirty-four acres of land of said tract, conveyed to William H. Ashley, as will appear by

deed of 1819, recorded in the recorder's office of St. Louis county." (8) The depositions and testimony abundantly prove that plaintiffs are the heirs of said Hammond, except Morrison, who claims an undivided interest under deeds of said heirs, as put in evidence, and that they all resided in the Confederate States during the war, and before and after. (9) That Easton owned the New Madrid land, which had been owned by Hunot, and was injured by the earthquake, was settled by the proper officers of the government. *Holmes v. Stroutman*, 45 Mo. 293. (10) Thus the steps taken, as above stated, by the owners of the New Madrid land, resulted in giving to Hammond, in 1833, a complete equitable title to the land in controversy. (11) The patent put in by defendants, as well as the act of congress, conclusively prove that the government has granted this land to Hunot's representatives, unless somebody else in possession can show a better outstanding live title. (12) The civil war between the United States and the Confederate States commenced on the nineteenth of April, 1861, in the states of South Carolina, Georgia, and Alabama, and lasted till April 2, 1866, and commenced in Tennessee August 16, 1861, and lasted till April 2, 1866. The same were Confederate States, and the statute of limitations was suspended as to residents in those states between said dates. *Hanger v. Nelson*, 10 Wall. 158; *Levy v. Stewart*, 11 Wall. 244; *Stewart v. Kahn*, 11 Wall. 493; *The Protector*, 12 Wall. 700; *Semmes v. Hartford Ins. Co.*, 13 Wall. 158; *Caperton v. Bowyer*, 14 Wall. 235, 236; *Brown v. Hiatt*, 15 Wall. 183, 184, 185; *Adger v. Alston*, 15 Wall. 555-560, 561; *Lassere v. Borhearean*, 17 Wall. 437; *Masterson v. Howard*, 18 Wall. 99; *Batesville University v. Kaufman*, 18 Wall. 151; *University v. Finch*, 18 Wall. 106; *Ross v. Jones*, 22 Wall. 587; *Mathews v. McStea*, 1 Otto, 7. (13) The plaintiffs' objection to the copy of the sheriff's deed should have been sustained. A copy cannot be used

without an affidavit that the original is not in the power of the party wishing to use it. R. S., secs. 697 and 2302; 40 Mo. 104. It was also proved that the original deed was in the hands of the clerk of the court. When the deed was made, there was no statute authorizing the use of a copy. *Miller v. Wells*, 5 Mo. 6; *Aubuchon v. Murphy*, 22 Mo. 123. (14) The description of the land attempted to be sold by the sheriff does not cover the north half of the Hunot survey, the part deeded to Hammond. (15) The court committed error in refusing to give plaintiffs' instruction numbered thirteen, as to the defence of adverse possession. *Gibson v. Chouteau*, 13 Wall. 92; *Langdeau v. Haines*, 21 Wall. 531; *Gibson v. Chouteau*, 50 Mo. 85; *McElhinney v. Ficke*, 61 Mo. 329; *Miller v. Dunn*, 62 Mo. 216; *Smith v. Madison*, 67 Mo. 705; *Dunn v. Miller*, 75 Mo. 260; *Buren v. Buren*, 79 Mo. 542.

*John B. Henderson* and *Jas. M. Lewis* for respondents.

(1) A sheriff's deed is a public record, made by disinterested and sworn officers of the law, and certified copies of such deed, or of the record thereof, by the proper recorder, are competent and primary evidence of the execution and contents thereof; and public policy, as well as the express statutes of the state, require that copies of such deeds shall be received in evidence on equal terms with the originals. R. S. 1879, secs. 2392, *et seq*. These sections are almost literally the same as sections twenty and twenty-one, of an act to regulate executions, embodied in the revision of 1825, and they have been continued without change from that time until the present. It is the universal rule of decision in states having statutes authorizing the use of copies of deeds, as provided in the execution law of Missouri, to admit such copies on an equal footing with the originals.

*Fouke v. Ray*, 1 Wis. 104; *Farrar v. Fessenden*, 39 N. H. 269; *Fellows v. Fellows*, 37 N. H. 75; *Hughes v. Debnam*, 8 Jones, 127; *Wells v. Wilson*, 3 Bibb. (Ky.) 265; *Dick v. Balch*, 8 Pet. 30; *Curry v. Raymond*, 28 Pa. St. 144; *Warne v. Hardy*, 6 Md. 525. (2) Peter Lindell, and those claiming under him, had claimed and enjoyed the land in controversy by and through the sheriff's deed, executed by John K. Walker, in 1823, to Relfe and Chew, for a period of forty years before defendants offered a certified copy thereof in evidence in this case, and, therefore, such certified copy was primary evidence, and equally admissible as such with the original, under section 2310. (3) The description of the land in the sheriff's deed is legally sufficient. *Wing v. Burgess*, 13 Me. 111; *Hart v. Rector*, 7 Mo. 531; *Marshall v. Greenfield*, 8 G. & J. 134; *Bates v. Bank*, 15 Mo. 309; 17 Mo. 583; *Dygert v. Pletts*, 15 Wend. 402; *Huggins v. Ketchum*, 4 D. & B. (N. C.) 414; *Parker v. Swanee*, 1 Humph. (Tenn.) 80. (4) Intermediate conveyances, made by one who has taken incipient steps to procure title, will be covered by the legal title when obtained, and will pass such title to the alienees, against the grantee and his heirs, and against his assigns with notice. And this doctrine equally applies, whether such intermediate conveyances are made by act of the grantee himself, or by the sheriff under judgment and execution against him. *Stoddard v. Chambers*, 3 How. 316; *Bissel v. Penrose*, 8 How. 317; *Taylor v. Brown*, 5 Cranch 553; *Stark v. Starrs*, 6 Wallace, 418; *Shepley v. Cowan*, 91 U. S. 337. (5) When Easton executed his deed to Hammond, on September 29, 1823, it related back to the date of his agreement to convey, made September 3, 1818, and the sheriff's deed, conveying Hammond's interest, was sufficient to convey any title that enured to Easton or Hammond under the patent issued by the United States. As between parties to a conveyance, the deed is presumed to have been exe-

cuted on the day of its date, and not on the day of its acknowledgment. *Abrams v. Pomeroy*, 13 Ill. 133 ; *Meldrum v. Clark*, 1 Morr. (Ia.) 130 ; *Beck v. Cole*, 4 Sandf. 79 ; *Dodge v. Hopkins*, 14 Wis. 630. (6) The bar of the statute of limitations has run against plaintiff since the issue of the patent, August 30, 1859. *Matthews v. McStea*, 91 U. S. 7 ; *Bond v. Moore*, 93 U. S. 593 ; *Clark v. United States*, 99 U. S. 493. (7) The Hunot patent was dated and recorded in the land office on August 30, 1859. The title, thereupon, passed to the grantees. When once recorded, the executive officers of the government have no power to revoke or cancel it. Hence, the statute of limitations commenced running against plaintiffs on said date. *United States v. Schurz*, 102 U. S. 378; *Hoofnagle v. Anderson*, 7 Wheat. 212 ; *Barry v. Gamble*, 8 Mo. 94. (8) Peter Lindell was the legal representative of Joseph Hunot on August 30, 1859, when the patent was issued to Joseph Hunot, or his legal representatives, and the legal title enured to said Lindell and his heirs and representatives before this suit was begun. *Cabanne v. Lindell*, 12 Mo. 184 ; 12 Mo. App. 591 ; *Hogan v. Page*, 2 Wall. 107 ; *Hughes v. Graves*, 39 Wis. 359. (9) The unbroken doctrine in Missouri, up to the publication of the decision of *Chouteau v. Gibson*, 13 Wall. 92 (1872), is, that an uninterrupted possession, notorious and adverse, for a period of ten years, under a claim of title, in a case like the one at bar, operates to vest the title in the claimant as effectually as though the land were conveyed by deed. *Biddle v. Mellon*, 13 Mo. 335 ; *Blair v. Smith*, 16 Mo. 273 ; *Shaw v. Nicolay*, 30 Mo. 99 ; *Hatfield v. Lindell*, 38 Mo. 561 ; *Nelson v. Broadhach*, 14 Mo. 599 ; *Wall v. Shindler*, 47 Mo. 282. The local law governs the transfer of legal and equitable title to real estate, and when rights are once vested, they cannot be impaired by adverse rulings of the courts, or by legislative enactments.

BLACK, J.—This is an action of ejectment for lot 50, in Peter Lindell's second addition to the city of St. Louis. The suit was begun on the fifteenth day of June, 1874. There was a judgment, on a trial by the court without a jury, for defendants, and the plaintiffs prosecute this appeal.

The title of the plaintiffs is as follows: Joseph Hunot claimed a head right of eight hundred arpents of land in New Madrid county, under a Spanish permission to settle, dated in 1802. The claim, based on possession and cultivation, was presented to the old board of commissioners, and was rejected in 1811. Subsequently, and, it would seem, on November 1, 1815, Recorder Bates recommended the claim for six hundred and forty acres. The report was confirmed by the act of congress of April 29, 1816. 3 U. S. Stat. 328. Before this, and on the twelfth of May, 1810, Hunot, by a warranty deed, conveyed the land to Joseph Vandenbenden, who, by a like deed, conveyed the same to Rufus Easton on November 4, 1815. The land having been injured by earthquakes, Recorder Bates, on the twelfth of August, 1816, issued to Joseph Hunot, or his legal representatives, what is known as New Madrid certificate, number 161, for four hundred and eighty acres of land, a certificate for one hundred and sixty acres having been previously issued. On the sixteenth of June, 1818, Rufus Easton made application to the surveyor-general to have certificate number 161 located on certain lands, being the same upon which it was subsequently located. A survey appears to have been made as early as June 23, 1819, which is known as survey number 2500, describing the four hundred and eighty acres of land. This survey was not returned by the surveyor-general to the recorder of land titles until the eighth of January, 1833. On the tenth of July, 1819, Rufus Easton conveyed to William Stokes two hundred and thirty-four acres, the same being the southern por-

tion of the survey, and by his deed, dated the twenty-ninth of September, 1823, acknowledged the ninth of October, 1823, and recorded the ninth of February, 1824, Easton conveyed the remaining two hundred and forty acres, being the northern portion of the survey, to Samuel Hammond. The lot in question is a part of the two hundred and forty acres.

Samuel Hammond left St. Louis largely indebted to the government and to individuals, and returned to South Carolina in 1824, where he died in 1842, leaving five children, one of whom is living. This child, Mary Washington, and the children and heirs of her deceased brothers and sisters, are plaintiffs in this suit. The other plaintiff, Morrison, in 1873–74, procured seven or eight deeds from some of the other plaintiffs, conveying to him a two-thirds interest in the survey.

The defendants put in evidence a certified copy of a sheriff's deed to Richard Relfe and Beverly Chew, conveying to them the two hundred and forty acres, it is claimed. Relfe, Chew, and Mary Clark commenced a suit in the St. Louis circuit court, in 1819, against Samuel Hammond, which resulted in a judgment in favor of plaintiffs. This judgment was affirmed in the then Supreme Court for the northern district on May 22, 1823. On the next day, an execution was issued against Samuel Hammond for $6,877, by virtue of which the sheriff levied upon the property, and on the eighth of October, 1823, sold the same to Relfe and Chew. The deed is dated the fourth of November, 1823, was acknowledged in the circuit court on the same day, and recorded on the twenty-seventh of January, 1824. It is a copy of this deed which was read in evidence. Relfe and Chew conveyed the land to Peter Lindell in 1840. Before that, and in 1834, Joseph Hunot made to Lindell a quit-claim deed for the whole survey. On the trial, it was stipulated that Lindell took possession of the survey in 1831, and that he, his heirs, and their grantee, Johnston,

have had, and held, continuous adverse possession down to the trial of this case.

Defendants put in evidence a patent from the United States, dated August 30, 1859, to Joseph Hunot, or his legal representatives. A plat of the survey is made a part of the patent, which shows that the survey conflicts with certain surveyed common-field lots, and these are excepted from the operation of the patent. It appears that in March, 1833, Peter Lindell transmitted the patent certificate to the general land office at Washington, and requested a patent. The matter was not attended to for a long time, and then only upon the agreement of Lindell that the exceptions before mentioned should be stated in the patent. Plaintiffs then put in evidence the act of congress of June 30, 1864 (13 U. S. Stat., Private Laws, 7), whereby the United States relinquished all their title to the land described in survey number 2500 to Joseph Hunot, or his legal representatives.

1. Various objections are made to the defendants' title, and especially to the sheriff's deed to Relfe and Chew. The first point is, that the court erred in admitting in evidence the certified copy from the recorder. When this deed was offered, counsel for the plaintiffs objected to the use of a copy, stating that the original was in the power of the defendants, but no proof was then made of the alleged fact, and the court received the copy. After the close of the defendants' case, the plaintiffs called the clerk of the court, who produced the original deed from the papers in another of these Hammond suits, which had been previously tried. The deed was shown to the judge, but neither party offered it in evidence. The court, at the time, made no ruling as to whether the original should be put in evidence by defendants, but, by an instruction, declared the deed to be lawful evidence in connection with the other evidence. Our statute makes various provisions with respect to the use of certified copies of deeds as evidence. Under section

697, Revised Statutes, the record, or a transcript thereof, is made evidence when it is shown to the court, by oath or affidavit, that the instrument is lost or not within the power of the person desiring to use it. Under this section, the deed must be acknowledged and certified according to the previous sections, which relate to deeds between individuals, and do not apply to the acknowledgment of a sheriff's deed. Other provisions, of a general character, are found, under the head of evidence, from sections 2299 to 2302, inclusive, making any deed or conveyance, acknowledged and certified according to the law in force at the date of the deed, evidence, and allowing a certified copy to be used when it shall be shown that the original has been lost, destroyed, or not in the power of the party desiring to use it. Plaintiffs insist that the copy of the sheriff's deed could only be used by complying with the sections of the statute before noticed, or some of them. Under the head of executions, it is provided that every officer executing a deed shall acknowledge the same before the circuit court of the county where the land is situate, and the clerk must endorse thereon a certificate of the acknowledgment. Then follows section 2395, which provides: "Every deed executed and acknowledged, as provided in the three preceding sections, or proved, shall be recorded as other conveyances of land, and, thereafter, such deed, or a copy thereof, or of the record, certified by the recorder, shall be received as evidence in any court in this state, without further proof of the execution thereof."

This section, it will be seen, is specific, and has reference to deeds made by officers upon sales under executions. It makes the deed, or a copy of the record, certified by the recorder, evidence, without further proof of the execution. Proof of loss, or inability to produce the original, is not made a condition to the use of the copy from the recorder. In this respect, the statute is

unlike those of a more general character, before noticed. This section has been a part of the statute law of this state ever since the revision of 1825, where it appears under the head of "Executions," as section 21. The statutes, with respect to conveyances and evidence, have undergone many changes, but this section remains substantially the same as when first adopted. It has been again and again held in other states that a certified copy of a deed, recorded and required to be recorded by a sworn public officer, is not secondary evidence, but stands on an equal footing with the original. *Curry v. Raymond*, 28 Pa. St. 144; *Dick v. Balch*, 8 Pet. 30; *Wells v. Wilson*, 3 Bibb. (6 Ky.) 264. The point actually ruled in *Smith v. Phillips*, 25 Mo. 557, was that the copy of the record of the sheriff's acknowledgment could not be read to prove that a deed had been made by the sheriff until proof was first made of the previous existence and loss of the deed. *Aubuchon v. Murphy*, 22 Mo. 123, and *Miller v. Wells*, 5 Mo. 6, have no relation whatever to a deed executed by a sheriff.

It results, from what has been said, that the statute before quoted was designed to, and does, make a copy of the sheriff's deed, from the recorder's office, as well as the original, primary evidence. The proceedings upon which the deed is based, that is to say, the judgment and execution, are matters of record, and it may be this is the reason for the distinction in favor of deeds executed by officers. But however that may be, the distinction exists, and a copy of the deed, duly certified by the recorder, is primary evidence, and it should be received in evidence as such.

2. The next objection to the sheriff's deed is, that Hammond, the debtor, had no interest in the land at the date of the judgment subject to sale under an execution. The deed from Easton to Hammond bears date September 29, 1823, and was acknowledged on October 9, 1823. The

judgment is treated by counsel on both sides as of date May 22, 1823, and the sheriff's sale was made on October 8, following; so that the sale was made after the date of the deed, but on the day before it was acknowledged. But this is not all. Rufus Easton owned the whole survey, and on July 10, 1819, conveyed the south two hundred and thirty-four acres to Stokes. This deed, in the description, calls for a "stone at the southwest corner of the Col. Samuel Hammond survey, thence east 4766 links to the southeast corner of said Hammond survey;" and this is the dividing line between the two portions of the survey. Again, the deed from Easton to Hammond, dated September 29, 1823, on its face purports to be made "in consideration of the sum of $1,583, to him in hand paid by the said Samuel Hammond, and pursuant to the conditions of a certain bond executed by said Rufus Easton to the said Samuel Hammond and James I. Wilkinson, dated September 3, 1818." This recital, it will be seen, is in a deed under which all the parties to this suit claim, and they are alike affected by it. This recital stands without any further explanation. It shows clearly enough that Hammond had an interest in the property as early as September, 1818, for if the deed was made in pursuance of a bond, what could the bond have been but one calling for a deed? It must have been a bond not only calling for a deed, but for a conveyance of this identical land. Hammond, then, had an equitable interest in the property, and that, too, long before the date of the judgment or sheriff's sale. That an equitable interest in real estate could be seized and sold on execution cannot be doubted. Terr. Laws, p. 120, sec. 45; *Brant v. Robertson*, 16 Mo. 149.

3. But upon this branch of the case, it is further contended that Easton had no interest in the property, because the surveyor-general had not, at that time, and did not until 1833, return a plat of survey number 2500 to the recorder of land titles; that the United States, as

yet, had parted with nothing, and hence the purchasers, at the sheriff's sale, got nothing. This position, if the correct one, would be equally fatal to the plaintiffs, but for the fact that Hammond held by warranty deed from Easton, but it becomes important to see what, if any, interest Easton, and, under him, Hammond, had. In *Mackay v. Easton*, 19 Wall. 630, it was held that there could be no effectual appropriation of the land located under a New Madrid certificate until the survey made by an officer of the government was returned to the recorder of land titles; that what is known as the New Madrid act contemplates that the title of the owner to the injured lands should pass to the United States at the same time that a right to the new location passed to the claimant; that the two things are concurrent, and this exchange takes place when the claimant obtains the patent-certificate for the new location. This certificate cannot be issued until the surveyor makes a return of the survey to the recorder.

It is this date, then, that fixes the rights of the claimant, though the patent may not be issued until long thereafter. And so it was held in the *Hot Springs Cases*, 92 U. S. 698. In those cases, no return of the survey had been made until after the passage of the act of April 20, 1832, by which the land was reserved to the United States, and, for this reason, it was held that the land never became so appropriated as to give the claimant a vested right. The act reserving the property, therefore, had full force and effect. The rule of these cases is relied upon by the plaintiffs to show that Hammond had no interest in the property subject to sale on execution.

But there are other rules of law deserving a consideration in this connection. In *Landes v. Brant*, 10 How. 373, it is said, quoting from Cruise: "There is no rule better founded in law, reason, and convenience than this, that all the several parts and ceremonies nec-

essary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation." In that case, the old board of commissioners granted a certificate for forty arpents of land to Clamorgan, under Dodier, in 1811. The confirmation was based upon previous possession of the claimant, and was allowed by reason of the second section of the act of 1807. Before this confirmation, and in 1808, Shray recovered a judgment against Clamorgan, under which the property was sold to McNair. Applying the rule of relation, it was held that the patent, issued in 1845, related back to the first substantial act, namely, that of filing the claim, which was in 1805, and hence the sheriff's deed was held to control the legal title when the patent issued.

In *Shepley v. Cowan*, 91 U. S. 337, the plaintiff claimed title under a patent issued by this state, dated in 1850, for lands selected by the state under the act of 1841. The defendants claimed title under a patent from the United States, dated in 1866, issued upon a preëmption right. It is there said: "The party who takes the initiatory steps in such cases, if followed up to a patent, is deemed to have acquired the better right, as against others, to the premises. The patent which is afterwards issued relates back to the date of the initiatory act, and cuts off all intervening claimants. Thus the patent upon a state selection takes effect as of the time when the selection is made and reported to the land office, and the patent upon the preëmption settlement takes effect from the time of the settlement as disclosed in the declaratory statement or proofs of the settler to the register of the local office." The court then proceeds to show that there is nothing in all this in conflict with certain other cases, where it is held that a party, by settlement only, upon public lands, with intention to obtain title under the preëmption laws, did not thereby

acquire a vested right, so as to deprive congress of the power to reserve or otherwise dispose of the land.

While the doctrine of relation is a fiction of the law, yet it will be resorted to when the ends of justice require it. It will be applied as between the person acquiring the title to land by successive acts and those who acquire an interest from or under him. *Callahan v. Davis*, 90 Mo. 78. Now, the act of February 17, 1815, for the relief of the inhabitants of New Madrid county, because of earthquakes, was designed to be for the benefit of those who owned the injured lands at the date of that act, or thereafter became the owners. *McCamant v. Patterson*, 39 Mo. 100. Vandenbenden was not then the absolute owner, for the title had not been confirmed to Hunot, but Vandenbenden had a deed from Hunot, dated in 1810, so that the plaintiffs must, and do, claim; and properly, too, that Vandenbenden acquired the legal title to the injured lands by force of the doctrine of relation. Easton became the owner of the land in November, 1815, and, at his instance, the New Madrid certificate was issued.

As legal representative of Hunot, he then applied to the surveyor, in 1818, to have the certificate located on the land described in the patent, giving to the surveyor a description of it, and, on June 23, 1819, the surveyor surveyed and made a plat of the land. In November, 1816, Easton executed and acknowledged a deed conveying the New Madrid land to the United States. It was not necessary that he should have made this deed, for when the exchange took place the law vested the title to the injured lands in the United States. But the act of applying to the surveyor to locate the land in question, in satisfaction of the certificate, and the act of the surveyor, in making the plat, were all necessary acts to procuring the patent ; and, as between Easton and those claiming under him, there is no reason why the patent should not relate back to the date of these acts. It is

true, beyond all doubt, that, as between Easton and those claiming under him, on the one hand, and the United States, on the other, that there was no vested right in Easton and those claiming under him, as against the United States, until the surveyor returned the plat to the recorder of land titles, which was not done until 1833. But as between Easton and third persons, he did acquire a priority and a right which the courts respect and uphold and enforce. This is clearly enough shown by the case of *Shepley v. Cowan, supra.* The fact that this right was not such as to deprive congress of the power of otherwise disposing of the land, makes it none the less a valuable right, and an interest in and to the land. It was a right subject to sale under execution, for the law then said that the sheriff's deed should be effectual for passing to the purchaser all the estate and interest which the debtor had at the time of the judgment. 1 Terr. Laws, p. 120, sec. 45.

4. Again, the further point is made that the sheriff's deed is void for uncertainty in the description of the premises. It describes the property sold as follows : "All the right, title, interest, estate, and property of the said Samuel Hammond in and to   *   *   *   a tract of land containing two hundred and forty arpents, more or less, bounded on the south by the land of Gratiot and Philipson, on the west by land of John P. Cabanne, and on the east by land of Wm. Stokes and others, and includes the big spring known by the name of the Hammond spring." It has been again and again ruled by this court that, however vague the description of the land in a sheriff's deed may be, parol evidence is admissible to identify the premises, and to show that in the community where the sale took place the land was known by the description given. *Hart v. Rector,* 7 Mo. 532 ; *Landes v. Perkins,* 12 Mo. 239 ; *Bates v. Bank,* 15 Mo. 309 ; *Bank v. Bates,* 17 Mo. 583.

The description in the sheriff's deed, in *Webster v.*

*Blount*, 39 Mo. 500, was, one hundred and ten acres, part of the northwest quarter of section number twenty-six, in township fifty-nine, of range thirty-four. The proof was, that the defendant in the execution in the attachment suit resided on the land for a number of years, and that the exact location of the one hundred and ten acres in that section was of public notoriety. It was there said that the description was amply good within the principles of the authorities before cited. In *McPike v. Allman*, 53 Mo. 551, the property was sold on an execution against John B. Crow, and the sheriff's deed described the property as "eighty acres, part of the west half of section thirty-one, township fifty-three, range five." The proof showed that Crow had previously sold one hundred and twenty acres off the north end of the west half of said section, and that he continued to own the balance of the half section, being 83 $\frac{12}{100}$ acres. The proof showed that the land was prairie land, unoccupied, and so was all the land around and adjoining it. It was known in the community that Crow owned the land. But in neither of the two cases last cited did it appear that the land was known by the particular designation given to it by the sheriff. In the case last cited, at page 561, the court said: "It would evidently be more satisfactory, where the description is so vague as it is in the case now being considered, that the parol evidence should prove some physical facts, which are accessible to all, by which the land can be identified when taken in connection with the description given, or that the land has acquired an appellation, or name, by which it is generally known, as in the case of *Hart v. Rector;* but it seems, from the cases, that no rule has been adopted on the subject." It is, then, held that the case was not distinguishable from that of *Webster v. Blount, supra*. Again, in *Adkin v. Moran*, 67 Mo. 100, the defendant relied upon a sheriff's deed, which described the land as "seventy acres P. N.

of N. E. of sec. 1, T. 59, R. 35." It was proved that Huffacker, against whom the execution was issued, owned and occupied the land in dispute; that there were about seventy acres of it; that the land was known in the neighborhood as Huffacker's land; that he owned no other land nearer than one mile, and that it was in the northeast part of the northeast quarter of said section one. The trial court excluded the deed, but this court reversed the judgment, saying that the case was not distinguishable from that of *McPike v. Allman, supra.*

In the case before us, the evidence shows that the entire Hunot survey, containing four hundred and eighty acres, is of an irregular shape. The northern and western lines are continuous; the southern is substantially so; the west line runs north from the south line some thirty-six chains; thence west some forty chains; thence north some sixty chains, to the north line. Thus, it will be seen, the southern portion of the survey extends east much further than the northern portion. It is this southern two hundred and thirty-four acres which was sold to Stokes by Easton before Hammond got his deed to the north two hundred and forty acres. At the date of the sheriff's deed, Gratiot and Philipson owned land adjoining the entire south line of the survey, but the two hundred and thirty-four acres, sold to Stokes, lies between them and the Hammond two hundred and forty acres. At the same time Stokes owned the land to the east of the south two hundred and thirty-four acres, Cabanne owned the land on the west line of the Hunot survey. While, perhaps, the description might be good for the whole Hunot survey, it gives accurately but one line of the two hundred and forty acres, and that is the western one.

But, besides this evidence, it is clearly shown that the two hundred and forty-acre tract was well known as the Hammond land. There was a log-house close to the

western line of the two hundred and forty acres well known as the Hammond house, and a noted spring near to it, known, in the community, as the Hammond spring. There is some evidence tending to show that Hammond's negroes lived in this house, and that Hammond, who lived in town, went out there to live during the summer. But the other facts, namely, that the two hundred and forty acres, the house, and the spring were well known, as before stated, are not disputed. Indeed, we have seen that the deed from Easton to Stokes called for the Hammond survey, which could have been none other than this two hundred and forty-acre tract. Had the sheriff omitted the references to Gratiot and Philipson, on the south, and Stokes, on the east, his description, in the light of the surrounding facts as they existed at that day, would have been infinitely better than that in several of the cases before cited, for what could it then mean but the two hundred and forty acres owned by Hammond, containing the big spring known as the Hammond spring? The call for the spring would fix and locate the tract with certainty. "Block 52, in DeKalb county, Mo.," was held to be a good description of a parcel of land, in the light of the proof that it was known as block 52 by the parties to the deed, and those in the neighborhood who were acquainted with it. *Tetherow v. Anderson*, 63 Mo. 96. In *Shewalter v. Pirner*, 55 Mo. 218, the description was: "A house and lot, situate on a strip of ground between the first addition and Anderson's addition to Lexington, fronting Pine street, and north of the Turners' Hall, in the city of," etc. There was but one lot on this strip north of "Turners' Hall," but that fronted on Cedar street, and not on Pine street. The court there, conceding the rule to be that known monuments would control courses and distances, proceeds to say that it is equally true that where there is a false call, or description, in a deed, and the false description can be rejected and leave

a sufficient description to identify the land, the false description will be rejected, and the remaining description, being sufficiently certain, will pass the title to the land.

So in this case, we may reject the calls for Gratiot and Philipson, and for Stokes, and still have a good and sufficient description, one which is in every respect sufficient to pass the two hundred and forty acres, and which is in perfect accord with all the circumstances existing at the date of the deed. This deed was made fifty years ago, and the property has been in the actual possession of the defendant, and those under whom he claims, for more than forty years, and no court would, under the evidence, be justified in pronouncing the deed void for uncertainty in the description of the premises. Surveyor Cozens, who surveyed this property for Lindell, many years ago, with the sheriff's deed before him, had no difficulty in finding the land.

We have not overlooked the fact that, during the progress of this trial, Mr. Cozens, an old surveyor, familiar with these lands and surveys from an early day, went to this property, found the spring, and the exact location of the old home, and reported that the old house was some four hundred feet, and the spring some two hundred feet still further east of the east line of the two hundred and forty acres, and, therefore, not on the Hunot survey, but on what is called the Conway survey. But he also says the line was not designated on the ground in 1823. If the land was known as the Hammond land, and was identified by the Hammond spring, it can make no difference that subsequent accurate surveyors throw the spring over the line and on the Conway location. The inquiry is, how was the land known and designated at the date of the sheriff's deed? Our conclusion is, that the description in the deed is good, and that it ought to be so held, on the undisputed facts in evidence, and we do so hold.

5. Fourteen years, nine months and fifteen days elapsed from the date of the patent to the commencement of this suit, while the period of our statute of limitations is ten years. The plaintiffs, to overcome the bar of the statute, show that, before, during, and after the late war, they resided in the Confederate States, and to that they couple the claim that the patent did not, in point of fact, become an operative grant until the twelfth of November, 1860. The facts relative to the last question are these: As before stated, Peter Lindell, in March, 1833, transmitted the patent-certificate, number 404, to the general land office, requesting a patent for the survey number 2500. Objections were made because the survey conflicted with certain Spanish and confirmed claims in the Grand Prairie Common Field. Thus the matter stood until 1858, when the surveyor-general called the attention of the commissioner of the land office to this survey. The commissioner, in a letter to the surveyor, dated August 25, 1858, states that Lindell had agreed to accept a patent which would except the adverse claims as shown on a diagram furnished by the surveyor. The surveyor was directed to notify the interested parties and to give public notice that unless valid cause was shown to the contrary, within three months from date of notice, the plat would be approved. The surveyor returned this new plat, showing the seven or eight adverse claims, to the recorder of land titles, who, on the eighteenth of February, 1859, issued a new patent-certificate in lieu of the old one. The plat was approved and the patent issued thereon bears date August 30, 1859. The evidence shows that the patent was signed, sealed, and recorded on the last-mentioned date. The patent excepts the adverse claims. On the sixth of April, 1860, the commissioner, in a letter to the recorder of land titles at St. Louis, directs him to notify the "parties opposed to the preparation of said patent," that if no appeal was filed in his office by May 7, following, the patent would

be sent to him for delivery. Whittelsey, for the Pacific railroad, in April, 1860, applied for an appeal, and on the twelfth of November, 1860, the secretary of the interior rendered a decision "in favor of issuing the patent," whereupon it was, upon the same day, sent to the recorder at St. Louis for delivery.

In *United States v. Schurz*, 102 U. S. 379, it is clearly and distinctly held that a patent to land from the United States is, in many respects, unlike an ordinary deed between persons; that in case of the patent, the title to the land conveyed passes, by matter of record, to the grantee; that the patent needs no delivery to give it full effect; and that when it is made out, signed by the President, sealed with the seal of the general land office, countersigned and recorded in the record books kept for that purpose, it needs no further authentication or delivery. In that case, the patent had been sent to the local officer for delivery, but in a few days, and before delivered, it was recalled and deposited with the secretary of the interior, before whom an appeal was pending involving the question as to who was entitled to the land by patent from the government. Although the appeal was pending before the secretary, he was required by mandamus to deliver the patent to the person therein designated as grantee. Although the commissioner of the general land office, in his letter to the recorder of St. Louis, speaks of the patent as one in preparation, still the facts are, that, after much deliberation and notice to all interested parties, the plat had been approved, the patent prepared, signed, sealed, and recorded. All this was done on or before the thirtieth of August, 1859. It was then a perfect and as complete a document as it was at any time thereafter. So far as we can see, it was then complete and every act required to be done to make it a grant had been done, unless it be held that delivery was essential. There is no claim that any of these acts had been done without authority. Besides all this, if the

title passed by matter of record, it would seem to follow that the decision of the secretary of the interior was but a decision in affirmance of what had been done; and we hold that the patent took effect as a grant on the thirtieth of August, 1859. So far as acceptance is concerned, it is sufficient to say that the patent was issued at the direct solicitation of Lindell.

If we are correct in this conclusion the plaintiff, who resided in Tennessee, is barred, for as to that state the war, it is conceded, did not begin until the sixteenth of August, 1861, and that it ended, as to that and the other states hereafter named, on the second of April, 1866. As to the states of South Carolina, Georgia, and Alabama, it was held in the case of *The Protector*, 12 Wall. 700, that the war began on the nineteenth of April, 1861, the date of the blockade proclamation, and ended on the second of April, 1866. The same dates were taken as fixing the time for the suspension of statutes of limitations in *Brown v. Hiatts*, 15 Wall. 177; *Adger v. Alston*, 15 Wall. 555, and *Ross v. Jones*, 22 Wall. 576. It is earnestly and with much force argued, that August 16, 1861, the date of President Lincoln's proclamation, declaring that the states before named were in a state of insurrection, and prohibiting commercial intercourse, should be taken as the date of the commencement of the war, and not the nineteenth of April, 1861, the date of the blockade proclamation. But we cannot see that the rule of those cases is modified in the later cases (91 U. S. 3; 93 U. S. 593; 99 U. S. 493), at least, so far as fixing the period during which the statute of limitations was suspended. Until modified, we accept them as fixing the dates by which the computation is to be made in cases like the present one.

6. From the instructions given and refused, it appears the circuit court held that the statute of limitations began to run against the plaintiffs before the date of the patent—before the legal title emanated from the United

States. This is in accord with the ruling of the court of appeals in *Hammond v. Coleman*, 4 Mo. App. 307, where it is, in substance, held that, when the grant from the government is to one, or his legal representatives, we may have recourse to the statute of limitations in determining who that representative is. This court has heretofore given and still gives to the case of *Gibson v. Chouteau*, 13 Wall. 92, a much broader scope. *McIllhinney v. Ficke*, 61 Mo. 329; *Miller v. Dunn*, 62 Mo. 216. As to the government there is no statute of limitations, and in the *Gibson case* it is held that the statute leaves the right of entry upon the legal title, subsequently acquired by the patent, wholly unaffected by the adverse possession; that such possession, either by the plaintiffs or defendants, will not control the legal title. This being so, we do not see how the statute can operate as a transfer of the equitable right.

7. We disapprove instruction number twenty-one, given at the request of the defendants. The sheriff's deed to Relfe and Chew, and a certified copy of it, were in court. The copy was in evidence, and it cannot be contended that any other deed was ever made, or intended to be made. There was no ground for presuming a deed, for the deed itself, the copy being *prima facie* equal to the original, was before the court. Why indulge in presumptions as to a thing when the thing itself is in proof? The copy, so far as it went, spoke for itself. *Reaume v. Chambers*, 22 Mo. 36. Where deeds were lost and the records of them defaced, so that some portions of the acknowledgment could not be made out, we allowed the presumption that the residue of the acknowledgments were formal. *Addis v. Graham*, 88 Mo. 200. But that is a different thing from presuming an entire deed from the record-entry of the sheriff's acknowledgment, when a copy of the deed is before the court; and this is what the instruction says may be done.

Notwithstanding these erroneous instructions, under the view we take of the sheriff's deed and the force and effect we give to it, the title is in the defendants, and the judgment will be affirmed. This result as to the effect of the sheriff's deed renders it unnecessary to pass upon the other questions presented by the record, but we have ruled upon them in order that there may be no embarrassment to either party in a review of this judgment in the Supreme Court of the United States. Much has been said with reference to common-field lots ; no claim is made that the property here in suit is a part of any such lot, confirmed to any individual under the act of June 13, 1812 ; nor is it found as a fact that it is a part of any such lot not claimed by an individual. Some of the evidence of Mr. Cozens tends to show that the property is west of Taylor avenue, and that the true west line of the old common fields is on, if not east of, Taylor avenue ; this being true, the property is not within the Grand Prairie Common Field. It is, therefore, conceived that the question whether the patent is void, or even voidable, by reason of the reservation in the second section of the act of 1812, is not presented by the record.

The judgment is, therefore, affirmed. All concur.

