BLOCK *et al.* v. MORRISON *et al.*, *Appellants.*

Division One, November 28, 1892.

|112|343|
|137|157|
|112|343|
|141|595|
|142|123|

1. **Land**: BOND FOR TITLE: EXECUTION. A title bond for the conveyance of land vests in the vendee an interest subject to sale on execution, and this was true under the provisions of the territorial laws in force on October 8, 1823. (1 Terr. Laws, sec. 45, p. 120).

2. ——: NEW MADRID LOCATION. While there was no vested right in the locator of a New Madrid certificate in the lands he purposed exchanging for his injured ones as between him and the United States before the official survey of the surveyor general was returned to the recorder, yet, where such locator procured a certificate of location, made application for its locator and for a survey, he acquired an interest in the land, which was subject to sale on execution.

3. ——: ——: RELATION. Where several proceedings are necessary to a government deed or patent, the last step will be deemed to take effect on the date of the first by relation, where the ends of justice so require, and the rights of third persons are not prejudiced.

4. **Supreme Court**: EXECUTION: COLLATERAL ATTACK. While a mere judgment of affirmance in the supreme court will not authorize an execution therefrom to enforce the part of the judgment relating solely to the affirmance, yet a sale of land thereunder is not collaterally assailable, especially after a lapse of fifty years.

*Appeal from St. Louis City Circuit Court.*—Hon: G. W. Lubke, Judge.

Affirmed.

*D. T. Jewett* with *Henry H. Denison* for appellants.

(1)  The execution issued by the clerk of the supreme court, in May, 1823, in favor of Relf and Chew and Mary Clark against Hammond, was without authority, for the debt or damages, and was utterly void—not simply voidable—as to the debt or damages named in the same.  There was no judgment of the supreme court for debt or damages, and the clerk had only authority to issue execution ordered by the judgment for costs and charges, and issue the usual mandate to the circuit court; and the circuit court should have issued execution for the debt and costs of that court.  To this point we cite:  Territorial Statutes of Missouri, sec. 5, p. 244; *Evans v. Wilder*, 5 Mo. 313; *Meyer v. Campbell*, 12 Mo. 607; *Musser v. Harwood*, 23 Mo. App. 495; *Walter v. Tabor*, 21 Mo. 75; *January v. Speddon*, 38 Mo. 395; *Wornecke v. Wood*, 50 Mo. 356; *Dobson v. Murphy*, 1 Dev. & Bat. 586; Freeman on Executions, sec. 20, p. 16, note 2, and cases cited.  (2)  Execution issued out of the supreme court on a judgment recovered in the common pleas court is absolutely void.  *Albee v. Ward*, 8 Mass. 79; *Martin v. Clark*, 37 Mo. 558; *Boyd v. Page*, 30 Me. 460; *Hastings v. Johnson*, 1 Nev. 613.  (3)  There is no evidence to show that the bond named in the deed from Easton to Hammond created a vendible interest in the obligee.  *Vide Brant v. Robertson*, 16 Mo. 149.  (4) An interest in land that a man can "lawfully part with" is a fixed and vested one, such as will control the land and exclude everybody else, if followed up.

Even more, it may exclude every one else, and still not be vendible on execution. *Bray v. Ragsdale*, 53 Mo. 170; *Broadwell v. Yantis*, 10 Mo. 403; *McIlvaine v. Smith*, 42 Mo. 55. (5) No title passed to the New Madrid locator, nor any priority of right till the survey was returned to the recorder of land titles, and was by him approved and recorded. *Bagnell v. Broderick*, 13 Pet. 436; *Stoddard v. Chambers*, 2 How. 294; *Barry v. Gamble*, 3 How. 51; *Lessieur v. Price*, 12 How. 60; *Hale v. Gaines*, 22 How. 144; *Rector v. Ashley*, 6 Wall. 142; *Gibson v. Chouteau*, 13 Wall. 92; *Mackay v. Easton*, 19 Wall. 633; *Hot Springs Cases*, 2 Otto, 712. (6) The doctrine of relation did not extend any further back than the date cf the return of the survey to the recorder of land titles, to-wit, January, 1833. *Lessieur v. Price*, 12 How. 60; *Rector v. Ashley*, 6 Wall. 142; *Bradford v. Wolfe*, 103 Mo. 399. (7) An application and survey will not maintain ejectment. *Gray v. Givens*, 26 Mo. 291.

*J. B. Henderson* and *Reynolds & Lewis* for respondents.

(1) No former action or judgment in ejectment constitutes a bar to this suit. Ejectment tries only the right to possession, not the title, and a judgment is no bar to a subsequent action between the same parties for the recovery of the same premises. *Kimball v. Benna*, 70 Mo. 52; *Cotter v. Skaggs*, 38 Mo. 302; *Holmes v. Carondelet*, 38 Mo. 551; *Prior v. Lambeth*, 78 Mo. 538; *Ekey v. Inge*, 87 Mo. 493; *Dunn v. Miller*, 8 Mo. App. 467; *Hogan v. Smith*, 11 Mo. App. 314; *Gibson v. Chouteau*, 7 Mo. App. 1. (2) It is urged against the sheriff's sale, made by Walker in 1823, that the execution was issued by the superior court instead of the district court. This precise objection came before this

court in *Meyer v. Campbell*, 12 Mo. 603, and was over-
ruled. Besides the execution was in the form required
by the law then in force. 1 Territorial Laws, pp. 55,
884-5. The title of a *bona fide* purchaser at a sheriff's
sale cannot be declared void in a collateral proceeding
on account of any error or irregularity in the judgment
or execution. *Landes v. Perkins*, 12 Mo. 238. (3) When
Easton executed his deed to Hammond on September
29, 1823, it related back to the date of his agreement
to convey, made September 13, 1818, and the sheriff's
deed conveying Hammond's interest was sufficient to
convey any title that inured to Easton or Hammond
under the patent issued by the United States. *Papin
v. Massey*, 27 Mo. 452; *Jackson v. Bard*, 4 Johns. 230;
*Crowley v. Wallace*, 12 Mo. 145; *Jackson v. McCall*, 3
Cowen, 75. (4) As between parties to conveyance a
deed is presumed to have been executed on the day of
its date, and not on the day of its acknowledgment.
*Abrams v. Pomeroy*, 13 Ill. 133; *Meldrum v. Clark*, 1
Marr. (Iowa) 130; *Breck v. Cole*, 4 Sandf. (N. Y.)
79; *Dodge v. Hopkins*, 14 Wis. 630. (5) New Madrid
locations, like all other inchoate titles to land, are sub-
ject to the doctrine of relation. *Landes v. Brant*, 10
How. 348; *Starr v. Starr*, 6 Wall. 418; *Shepley v.
Cowan*, 91 U. S. 337. The only limitation placed by
the courts on the doctrine of relation is that it shall
not work injustice to the rights of innocent third par-
ties acquired between the events which it is proposed
to unite by relation. *Vancourt v. Moore*, 26 Mo. 92;
*Jackson v. Bard*, 4 Johns. 230; *Fight v. Doe*, 1 Blackf.
127; *Sampson v. Thornton*, 3 Met. 275; *Papin v. Massey*,
27 Mo. 445.

BLACK, J.—This is an action of ejectment to
recover lot 60 in Peter Lindell's second addition to the
city of St. Louis. This suit was commenced by the

Fourth National Bank of St. Louis. The bank conveyed the lot to Block and Holthus pending the suit and they were then substituted as plaintiffs. They recovered in the circuit court, and the defendants appealed.

The facts of the case, so far as are material to the questions raised in this court, are these:

Joseph Hunot claimed a head right under a concession dated in 1802, for eight hundred arpents of land in what is now New Madrid county. In 1810 he conveyed the land to Joseph Vandenbenden. The claim was presented to the first board of commissioners for confirmation, but the board rejected and disallowed it on the thirty-first of January, 1811. It was presented again to Frederick Bates, recorder of land titles, and by him approved and recommended for confirmation on the first of November, 1815. The claim was then confirmed by the act of congress of April 29, 1816. Prior to the confirmation, Vandenbenden conveyed the land to Rufus Easton by a deed dated the fourth of November, 1815. It is conceded that the effect of this confirmation by congress was to vest the legal title to the land in Easton.

The land having been injured by earthquakes, Easton sought to exchange it for other lands under the provisions of the act of congress of February 17, 1815, entitled "An act for the relief of the inhabitants of the county of New Madrid in the state of Missouri, who suffered by earthquakes." On the twelfth of August, 1816, the recorder of land titles issued a certificate stating that Joseph Hunot or his legal representatives were entitled to locate four hundred and eighty acres under the provisions of said act. This certificate is known as New Madrid certificate number 161.

On the sixteenth of June, 1818, Rufus Easton, as the legal representative of Hunot, made application to

locate the certificate on four hundred and eighty acres of land, giving a general description of the land, in the application. The deputy surveyor surveyed the land, and on the twenty-third of June, 1819, certified this survey to the surveyor general. This survey was designated and is known as survey number 2,500. The surveyor general transmitted this survey and the plat made a part of it to the recorder on the eighth of January, 1833. The latter recorded the same on the second of February, 1833, and on that day issued a patent certificate to Joseph Hunot or his legal representatives for the four hundred and eighty acres. This patent certificate was delivered to Peter Lindell, and it was forwarded to the general land-office. Conflicting claims were interposed, so that the patent was not issued until the thirteenth of August, 1859.

As has been stated, Easton signified his desire to locate his certificate on the land on the sixteenth of June, 1818, and the survey and plat were made on the twenty-third of June, 1819; but the plat and survey were not filed with the recorder until early in January, 1833.

Rufus Easton, by his warranty deed dated the twenty-ninth of September, 1823, acknowledged by him and his wife on the ninth of October, 1823, and recorded on the ninth of February, 1824, conveyed two hundred and forty of the four hundred and eighty acres to Samuel Hammond. This deed contains a recital that it was made "in consideration of $1,583 to him in hand paid by said Samuel Hammond, and pursuant to the conditions of a certain bond executed by the said Rufus Easton to said Samuel Hammond and James I. Wilkerson, dated September 3, 1818." On July 19, 1819, Easton conveyed the residue of the four hundred and eighty acres to William Stokes. There is evidence that Hammond went into possession under

his title bond and remained in possession for several years. On the eighth of October, 1823, the sheriff sold the two hundred and forty acres to Richard Relf and Beverly Chew by virtue of an execution issued upon a judgment against Samuel Hammond, and executed to them a deed, dated the fourth of November, 1823. Relf and Chew conveyed the land to Peter Lindell in March, 1840. Lindell also held a deed to the land from Hunot, dated in 1834, and it appears that Lindell took possession at that date and continued his possession until his death in 1861. The lot in question is part of the two hundred and forty acres, and was set off to one of the heirs of Lindell in the partition of that estate. The plaintiffs have acquired all the title of such heir by deeds in due form.

The defendants claim title by deeds from the heirs of Samuel Hammond, obtained since 1870. They got possession of the land in 1879 by virtue of an execution on a judgment in an ejectment suit against the tenant of the heir of Lindell, to whom the lot had been assigned in the partition suit. The bank brought this suit to regain possession in 1882.

From the foregoing statement it will be seen that all parties to this suit claim under Samuel Hammond, the defendants through the heirs of Hammond, and the plaintiffs under the sheriff's deed. The title is with the defendants, unless the sheriff's deed divested Samuel Hammond of his interest in the land.

The defendants assail the sheriff's deed on several grounds, and the first is that Hammond had no interest in the land at the date of the sheriff's sale which could be sold on execution. The sheriff sold the land under the execution against Hammond on the eighth of October, 1823, and the deed from Easton to Hammond bears a prior date, viz., the twenty-ninth of September, 1823, but was not acknowledged until the ninth of

October, 1823, the day after the sheriff's sale. The plaintiffs insist that the presumption is, in the absence of other proof, that the deed to Hammond was executed and delivered on the day of its date, though acknowledged at a subsequent date. Such seems to be the rule generally asserted. 1 Devlin on Deeds, sec. 265; *Dodge v. Hopkins*, 14 Wis. 630. But we express no opinion on this question at this time in view of what was said in *Fontaine v. Boatmen's Savings Inst.*, 57 Mo. 552.

The deed from Easton to Hammond states that it was made in consideration of $1,583, paid by Hammond, and pursuant to the considerations of a certain bond executed by Easton to Hammond and Wilkinson, dated the third of September, 1818. Hammond, therefore, held a title bond for the conveyance of the land as far back as 1818, which was before the date of the judgment under which the property was sold. Did this title bond create in the vendee an interest in the land which was subject to sale under execution? The answer must be in the affirmative. The statute in force at that time provides that the sheriff's deed "shall be effectual for passing to the purchaser all the estate and interest which the debtor had or might lawfully part with in the lands at the time judgment was obtained." 1 Territorial Laws, 120, sec. 45.

In *Brant v. Robertson*, 16 Mo. 129, this court said: "When parties have bound themselves by agreement to convey land and to pay for it, equity recognizes an interest in the land as already in the purchaser, and the case is the stronger when the purchaser has actually paid in whole or in part; and in either case, the interest of the purchaser may be sold on execution, upon the principle that the vendor is to be regarded as seized in equity to the use of the purchaser. But if no money has been paid, and if the person who may become the purchaser is not actually under any obligation to pay,

then there is no seizin in the seller, even in equity, to the purchaser's use, and there is no interest in the land in him which is liable to sale on execution." It is true the statute then in force made "all real estate, whereof the defendant, or any person for his use, was seized in law or equity," subject to sale on execution; and "real estate" was defined to be "all estate and interest in lands, tenements and hereditaments." The words of the statute then in force were different from the words of the statute now in question, but there is no substantial difference in their meaning. The statute now in question makes any interest in land which the debtor may sell subject to sale under execution. That a title bond for the conveyance of land gives the vendee an interest which he may sell cannot be doubted. The principle of law is well settled that, where there has been a contract for the sale of land, the vendor becomes the trustee of the land for the vendee, and that the vendee has an interest in the land which may be sold under execution. *Papin v. Massey*, 27 Mo. 445; *Hart v. Logan*, 49 Mo. 47; *Morgan v. Bouse*, 53 Mo. 219. In some of these cases the vendee had been put in possession, and in others the whole or a part of the purchase money had been paid; these circumstances may make out a stronger case, but the principle still stands, that the vendee in a title bond has an interest in the land which he may sell, and which he may enforce by specific performance, and which is subject to sale under execution.

The case of *Broadwell v. Yantis*, 10 Mo. 399, is not in conflict with what has been said. There the vendee in the title bond sold his right and transferred the bond to another person, and after that he, of course, had no interest in the land subject to execution. In the case of *McIlvaine v. Smith*, 42 Mo. 45, the court said: "Smith had no seizin or possession of the land, no

power to dispose of any estate in the land, or to enjoy the occupancy or to collect the rents; nor could he call upon the trustee to execute any conveyance." Under these circumstances it was held, and properly held, that he had no interest subject to sale on execution. Here the vendee had an interest by force of the title bond which he could enforce, and an interest which he could sell. It is true that the last sentence in the quotation which we have made from *Brant v. Robertson* is to the effect that, if the purchaser is not actually under any obligation to pay, then there is no seizin to the use of the vendee. It is not now necessary to say whether the holder of a mere option to purchase would or would not have an interest subject to execution sale. A bond to convey on the payment of a given sum implies an agreement to pay. We hold that the bond recited in the deed vested in Hammond an interest in the land which was subject to sale under an execution.

2. The defendants insist, in the next place, that there was not a particle of title, legal or equitable, out of the United States and in Hammond at the date of the execution sale, and that he had nothing which could be sold, because the surveyor general did not file the survey with the recorder until early in 1833, which was about ten years after the land was sold under the execution. To establish this position we are cited to a number of cases, some of which will be specially noticed.

*Rector v. Ashley*, 6 Wall. 142, was a bill in equity and a cross-bill, both parties seeking to quiet his title as against the other. Ashley claimed under an act of congress of June 23, 1830, granting a designated quantity of land to the state of Arkansas, out of any *unappropriated* lands. Ashley's title was perfected under this act, so that the legal title became vested in him.

on the eighth of June, 1838, unless the land had been previously appropriated by a New Madrid certificate under which Rector claimed. This New Madrid certificate was issued to Cocherham. His legal representative gave to the surveyor of public lands a writing, dated October 30, 1820, stating that he located the same on the land in question. A survey was made of date the thirtieth of May, 1838, which was filed with the recorder of land titles the sixteenth of June, 1838, after Ashley's title had been perfected under the act of 1836. The question was, whether these proceedings under the New Madrid certificate established such a right in the parties who represented the certificate as to withdraw the land from the list of *unappropriated* lands, and thereby defeat the Ashley title under the act of 1836. The court refers to the prior cases of *Bagnell v. Broderick,* 13 Pet. 436; *Barry v. Gamble,* 3 How. 32, and *Lessieur v. Price,* 12 How. 60, in which cases it was held that the United States never deemed the land appropriated by a New Madrid certificate until the survey was returned to the recorder of land titles; that it was the plat and certificate of survey returned to the recorder which constituted a location; and it was then and not before that the exchange of titles took place under the act of February 17, 1815. The court then holds, as it had before held, that the return of the survey to the office of the recorder of land titles is essential to an appropriation of the land under such certificates; that until this is done the claimant acquires no vested rights. As said in *Mackay v. Easton,* 19 Wall. 619: "Until the plat was placed in the public depository in the territory of evidences of title issuing from the United States, there was no official recognition of the proceedings taken by the claimant which bound the government." Hence, it was held in the *Hot*

*Springs Cases*, 92 U. S. 698, that, until the survey was returned to the recorder's office, the government could withdraw the land from sale, and thereby defeat any previous steps taken to locate the certificate on the particular tract.

Now these cases show, and they show beyond all question, that there is no vested right in the locator of a New Madrid certificate to the lands which he proposes to take in exchange for his injured lands, *as against the United States*, until the survey has been returned to the recorder of land titles; but in our opinion they do not show, nor is it held in any of them, that the locator acquires no right as between himself and those claiming under him. As between the locator and persons claiming under him, they may and often do acquire rights which may be asserted and which the courts will protect.

In *Landes v. Brant*, 10 How. 348, Clamorgan claimed an interest in the land under Dodier, who had an imperfect Spanish grant. This claim was presented to and confirmed by the first board of commissioners in 1811, and a patent was issued to Clamorgan in 1845. In 1808, which was prior to the confirmation by the old board, Sarpy recovered a judgment against Clamorgan, under which the property was sold and conveyed to McNair by a sheriff's deed dated in the same year. The court held that Clamorgan's interest in the imperfect Spanish claim was subject to execution, and approved in express terms what this court had said on the same subject in *Landes v. Perkins*, 12 Mo. 254. See also *Massey v. Papin*, 24 How. 362. It was also further held in the *Landes-Brant case* that the patent when issued related back to the time that the claim was filed for confirmation, namely, in December, 1805, so that the legal title conveyed by the patent inured to the benefit of the grantee in the sheriff's deed. The court

applied the principle "that all of several parts and ceremonies necessary to complete a conveyance shall be taken together as one act, and operate from the substantial part by relation."

Looking now to the act of congress of February 17, 1815, it will be seen that several steps must be taken to effect an exchange of the injured lands for others, which are pointed out in the *Hot Springs Cases* before mentioned, and are in substance these: *First.* An application by the owner of the injured land to the recorder of land titles for a certificate. *Second.* A certificate to be issued by the recorder. *Third.* Application by the holder of the certificate to the surveyor for a location of the certificate, designating in general terms the land desired. *Fourth.* Survey of the land and plat by the surveyor. *Fifth.* A return of the survey and plat to the recorder. *Sixth.* Then follows the patent certificate to be issued by the recorder, the transmission of the patent certificate to the land-office and the issue of the patent.

In this case Easton procured a certificate of location, made application to the surveyor for a location of it on the land, and had a survey made by the proper officer, which survey and plat were certified to the surveyor general in June, 1819. In the meantime he executed the title bond, dated the third of September, 1818, to Hammond for two hundred and forty acres, and Hammond took possession of the land. On the tenth of July, 1819, Easton conveyed the residue of the tract to Stokes. Easton had then signified his intention in a proper form to appropriate the land in satisfaction of his certificate. He was pursuing the course specified by the act of congress to bring about and perfect the exchange of lands. It was because of these steps taken that Stokes and Hammond were induced to purchase the land. As against Stokes and

Hammond, would he be heard to say he had no interest in the land? Surely not. It is perfectly clear that this bond and the deed gave Hammond and Stokes the right to go on and perfect the location as it was subsequently perfected. When perfected they would become the legal owners of their respective parcels of land so purchased from Easton. This was a valuable right acquired by them to and in the land by reason of the deeds, and it was none the less a valuable right because the government could have appropriated the land to other purposes at any time before the plat and survey were filed with the recorder of land titles. Easton acquired a right in the land which he had a right to and did transfer to Hammond, and which Hammond could have transferred. As Hammond had an interest which he could lawfully part with, it follows that this interest was subject to sale under execution, under the statute before mentioned. That interest passed by the sheriff's deed to Relf and Chew, and by their deed to Lindell. When the patent was issued it related back, at least, to the time that Easton made his application to the deputy surveyor to have the New Madrid certificate located on the land.

The doctrine that, when several proceedings are essential and necessary to a deed or patent, the last will be held to take effect by relation on the date of the first, is well settled. Though a fiction of law, it will be applied where the ends of justice require it to be applied, and the rights of third persons are not prejudiced. *Lessee of French v. Spencer*, 21 How. (U. S.) 228; *Shepley v. Cowan*, 91 U. S. 337; *Jackson v. Ramsey*, 3 Cow. 75; *Callahan v. Davis*, 90 Mo. 78; 3 Washburn on Real Property, 328. The claims that the doctrine of relation can have no application to a New Madrid location prior to the return of the survey to the recorder is in our opinion not well founded, and

not supported by any of the authorities cited to prove that proposition. Right and justice call for the application of the rule in this case, and no reason is seen why it should not be applied.

The foregoing objections to the sheriff's deed were considered in the case of *Hammond v. Johnston*, 93 Mo. 198, but we have traveled over the ground again in view of the great value of the property involved and the earnest arguments made on the hearing of this case.

3.   There is another objection to the sheriff's deed not made or considered in the *Hammond–Johnston case*, and that is this, that it is void because the execution issued out of the supreme court instead of the circuit court.

The facts are that Richard Relf, Beverly Chew and Mary Clark obtained a judgment in the circuit court against Samuel Hammond in August, 1819, for $6,841.80.   Hammond sued out a writ of error and procured a *supersedeas* by giving bond.   On the twenty-third of May, 1823, the supreme court gave judgment "that the judgment aforesaid in form aforesaid rendered be in all things affirmed," and that plaintiffs "recover against the said Samuel Hammond their costs and charges by them about their defense in this behalf expended, and that they have thereof execution."   On the twenty-eighth of May, 1823, the clerk of the supreme court issued an execution to the sheriff of St. Louis county, reciting therein that the plaintiffs had recovered a judgment against defendant for $6,877.43 and their costs and charges, and commanding the sheriff to make said sum and the costs and charges, the costs being taxed at $37.63.   Under this execution the sheriff sold the two hundred and forty acres and several other parcels of land on the eighth of October, 1823, and Relf and Chew became the purchasers.

The statute in force at the date of the judgment

and execution provided that it should be the duty of the supreme court, in all cases of appeal or writs of error, to examine the record and to award a new trial, reverse or affirm the judgment of the circuit court, or give such judgment as the said court ought to have given. 1 Territorial Laws, sec. 58, p. 855. Section 60 provides: "In all cases of appeal or writs of error decided by the supreme court, the said court may order the record in the cause, with their decision and determination thereon written, * * * to be transmitted to the proper circuit court, on payment of the costs incurred in the supreme court, and such decision and determination shall be duly carried into execution by such circuit court, or the supreme court may award execution to carry the said decision and determination into effect.

The earliest decision of this court which we have found construing these statutes is *McNair v. Lane*, 2 Mo. 57. In that case there had been a judgment in the circuit court, which was affirmed on a writ of error to the supreme court. Execution was issued out of the supreme court for the debt and costs, and under that execution the real estate of the debtor was sold. In that case it was contended that the circuit court alone had power to award execution where its judgment was affirmed; but it was held that the supreme court could award execution on a judgment of affirmance. To be advised of the practice at that date we have examined that judgment, and find that it was a simple judgment of affirmance with a judgment for costs. It was in all respects like the one now in question.

*Evans v. Wilder*, 5 Mo. 314, was also an action of ejectment. The defendant gave in evidence three judgments of affirmance and executions issued thereon out of this court, under which the land was sold. This court said: "The third point in argument is that

the executions issued from this court without any judgments. The records show that there were in this court three several judgments for costs at least. It seems to me that these executions might well have been quashed on the return, on the application of Price, but that he would not be heard on this question after the money had been paid over by the sheriff, much less can he be heard after this length of time; nor do I see how it can be right after a lapse of many years to hold the sale void in a collateral way. But I think the executions would, at no time, have been quashed as to the costs of this court. This point is ruled for the appellee." The appellee claimed title under the executions.

*Meyer v. Campbell*, 12 Mo. 603, was also an action of ejectment. The plaintiff put in evidence the very deed, it would seem, which is now in question. The question raised in the lower court was whether the execution enforced the lien of the judgment of the circuit court. The court, speaking through Judge NAPTON, discusses the statutes above quoted at length, and reaches these conclusions: That a judgment of affirmance of the supreme court is a judgment that the circuit court proceed to execute its own judgment; that the affirmance being certified to the circuit court, that court proceeds to carry its own judgment into effect; that when this court designs to carry its own judgment of affirmance into effect a judgment of recovery should be added. Accordingly, it was held that the execution did not enforce the lien of the judgment of the circuit court. But the court was careful to say: "We do not wish to be understood as deciding that the execution which issued upon the judgment of the supreme court in 1823, in favor of Relf and Chew, was void. The question arose in the case of Evans *v*. Wilder, and the court was then of opinion that the judgment was good,

at least for costs, and seemed inclined to sustain a title acquired under the execution, although it was intimated that such an execution would be set aside upon a direct application for that purpose."

Since the decision in that case a judgment of affirmance has been understood to be a judgment that the circuit court proceed to execute its own judgment, which is pronounced valid and in full force. *Slagel v. Murdock*, 65 Mo. 522; *Walter v. Tabor*, 21 Mo. 75; *Wilburn's Adm'r v. Hall*, 17 Mo. 471. And it follows that regularly an execution should not be issued out of this court to enforce that part of a judgment which is simply and solely a judgment of affirmance. But it does not follow that this sale should be held void. The practice was unsettled at that early day. In one case a sale under an execution issued out of this court on a judgment of affirmance was held regular. In another case three like sales were held valid, though voidable by a timely motion to quash, and, at a subsequent date, the court clearly stated that it would not disturb that ruling; and that, too, in a case where this deed was brought in question.

More than fifty years have lapsed since this sale was made. Under these circumstances we are asked to hold this sale void, and this we decline to do. We hold that the sale was and is valid in this collateral proceeding; and in saying this we assume that it appears from the sheriff's return that the first piece of property sold brought more than enough to pay the costs, and that it appears from that return that the property in question was the second piece sold.

With the foregoing conclusions it follows that the judgment should be and it is affirmed. BARCLAY, J., not sitting, the other judges concur.