## KINGMAN et al. v. HOLTHAUS et al.

### (Circuit Court, E. D. Missouri. December 18, 1893.)

1. FEDERAL COURTS—LOCAL AND FEDERAL QUESTIONS—JUDGMENTS.

The dismissal by the supreme court of an appeal from a state supreme court on the ground that a local question decided was broad enough to dispose of the case, independent of any federal question, is conclusive in a subsequent suit in a federal court involving the same facts and questions, and the alleged federal question will not be considered.

2. SAME—JURISDICTION—FEIGNED CITIZENSHIP.

A suit will be dismissed when it appears that one of the parties, in order to enable him to invoke federal jurisdiction, has merely rented a room in an adjoining state, and sleeps there nights, without changing the place of his business or of taking his meals.

3. DEEDS—RECITALS—EVIDENTIARY EFFECT.

The recital in a deed that it is made in consideration of a certain sum, "and pursuant to the conditions of a certain bond," warrants the conclusion that the bond mentioned was a title bond of the land.

4. ADVERSE POSSESSION.

Occupation of a house and premises actually included in a tract, under color of title to the tract, is, in legal contemplation, possession of the tract, notwithstanding that a subsequent survey may throw the house outside its boundaries.

5. PUBLIC LANDS—EFFECT OF LOCATION—EXECUTION SALE.

An incipient location of land under a New Madrid certificate, though it gave the locator no title as against the government, yet gave him an equitable interest, which he could sell to another by a title bond, good as between themselves, and which could be sold on execution against the obligee; and, on the subsequent issuance of a patent to the original locator, it would inure to the benefit of the person claiming under the sheriff's deed.

At Law. Action of ejectment brought by Mary A. E. Kingman and others against Louis J. Holthaus and others. A jury was waived, and the case submitted to the court. Case dismissed as to one plaintiff, and decree for defendants as to the others.

Statement by PHILIPS, District Judge.

This is an action of ejectment, instituted February 4, 1893, to recover lot No. 60 in Peter Lindell's second addition to the city of St. Louis, Mo., containing about 17 acres of land. Some of the plaintiffs are the descendants of Samuel Hammond, and the remaining plaintiffs claim under deeds of quitclaim from the said descendants, executed in 1874 and subsequently. The parties claim under a common source of title. The history is as follows:

The premises sued for are described as "United States Survey No. 2,500," located under New Madrid certificate No. 161, issued to one Joseph Hunot, or his legal representatives. A Spanish concession was made to said Hunot in 1802 for 800 arpents of land lying in New Madrid county, Mo. In 1810 said Hunot conveyed said land in New Madrid county to one Vandenbenden. In 1815 said Vandenbenden conveyed said land to one Rufus Easton. This claim was confirmed by act of congress April 29, 1816. This land was injured by earthquakes, and thereafter said Easton applied to exchange it for other land, pursuant to the act of congress of February 17, 1815, for the relief of the earthquake sufferers in said county. A New Madrid certificate was issued (No. 161) August 12, 1816, setting forth that said Hunot, or his legal representatives, were entitled to locate 480 acres on any of the public lands of the territory of Missouri, the sale of which is authorized by law, in lieu of the New Madrid land. On June 16, 1818, Easton, as assignee of Hunot, applied to locate this certificate on the premises

v.59F.no.3—20

in question. The land was surveyed as survey No. 2,500, and certified to the surveyor general June 23, 1819, and the surveyor general transmitted it to the recorder January 8, 1833; and it was recorded February 2, 1833, and the patent certificate issued to said Hunot, or his legal representatives. The patent from the United States to the said Hunot, or his legal representatives, bore date August 30, 1859. On some objection interposed by the Pacific Railroad Company, the patent was withheld by the secretary of the interior, and delivered November 12, 1860, to Peter Lindell.

By Act Cong. June 30, 1864, the United States conveyed to said Hunot, or his legal representatives, the said land. On September 3, 1818, said Easton executed a title bond to said Samuel Hammond and James J. Wilkinson for the said land, except 234 acres. On July 10, 1819, said Easton conveyed said 234 acres to one William Stokes by deed of warranty. On May 23, 1823, an execution issued from the clerk's office of the supreme court of Missouri on a judgment theretofore recovered in said court by Richard Rolfe, Beverly Chew, and Mary Clark against said Samuel Hammond for the sum of $6,877.43½, under which execution the sheriff of St. Louis county, on the 5th day of September, 1823, levied upon and seized all the right, title, interest, and estate of said Hammond in said land, and on the 8th day of October, 1823, the said sheriff sold said property under said execution to said Chew and Rolfe, as the highest bidders, at the sum of $100. On the 29th day of September, 1823, said Easton conveyed to said Hammond said land by deed of warranty containing the recitals hereinafter mentioned in the opinion of the court. September 9, 1824, the United States recovered judgment against said Hammond in the United States district court of Missouri for $26,680.35. Execution issued thereon October 9, 1824, returned March 9, 1825, nulla bona and non inventus est; said Hammond having theretofore quit the state, and removed to the state of South Carolina. Upon an execution and capias issued on said judgment, the said Hammond availed himself of the insolvent law, and obtained his discharge in bankruptcy, after conveying by schedule to the United States all of his property, without mentioning the property in question.

There was evidence tending to show that Hammond, from the time of taking the title bond from Easton to this land, in 1818, up to the time of the execution sale, was in possession thereof. In December, 1834, said Hunot conveyed by deed said land to Peter Lindell. March 20, 1840, said Chew and Rolfe conveyed said land to said Peter Lindell. There was evidence tending to show that said Lindell, from 1834, and his heirs, were in possession of this land, under claim of title, up to the time of this litigation. There was evidence offered on behalf of the defendants respecting the reservation of this property as village lots or common field lots of St. Louis, reserved for public school purposes, and an act of the legislature of Missouri, February 13, 1833, incorporating the board of president and directors of the St. Louis public schools, authorizing the said board to sell and dispose of all school lands owned by said board; also, a deed of conveyance, dated August 30, 1845, from said school board, conveying to the said Lindell all the right and title of said board in and to the lots or lands covered by said survey No. 2,500. The defendants also put in evidence certified copies of the survey of certain lots in the Grand Prairie common fields of St. Louis. The heirs of said Hammond, who had previously died, were, during the civil war, citizens of the states of South Carolina, Georgia, Alabama, and Tennessee. Several years after the war, these heirs were found by the promoters of this litigation, and deeds of quitclaim obtained from them for an interest in this land; and said heirs and their grantees instituted this litigation in the state circuit court of St. Louis in June, 1874, to recover possession of this land. In this first litigation the plaintiffs obtained judgments in the local state court, and obtained temporary possession of the land thereunder. Actions of ejectment were then instituted by those claiming through and under said Peter Lindell against said plaintiffs, in which they recovered judgments in the state court, which judgments were affirmed by the supreme court of the state; and thereafter the said plaintiffs instituted actions of ejectment for this land in the United States circuit court of the eastern district of Missouri, at St. Louis. A jury being waived, the case was submitted to

the court for hearing. Other facts will appear in the opinion of the court hereto attached.

Leverett Bell and D. T. Jewett, for plaintiffs.

John B. Henderson and James M. Lewis, for defendants.

PHILIPS, District Judge, (after stating the facts.) This case, in its controlling facts and principles of law, is identical with those of Hammond v. Johnston, reported in 93 Mo. 198, 6 S. W. 83; Block v. Morrison, reported in 112 Mo. 343, 20 S. W. 340; Hammond v. Insurance Co., (Mo. Sup.) 20 S. W. 344. From these decisions, which were adverse to the plaintiffs, they sued out writs of error to the supreme court of the United States, only one of which has been reached for hearing in the latter court, (Hammond v. Johnston, reported in 142 U. S. 73, 12 Sup. Ct. 141,) and it was dismissed on the ground that the record presented no federal question reviewable by that court; and as the decision of the state court was adverse to plaintiffs, upon grounds independent of any federal question, "and broad enough to maintain the judgment," the adjudication by the state court stands affirmed. This latter case was decided in the state supreme court at the October term, 1887. Yielding to the persistent insistence of these plaintiffs, the state supreme court, at the October term, 1892, in the Block Case, again considered and reviewed, in a more elaborate opinion, all the questions of law raised by the learned counsel for plaintiffs, and reaffirmed its first decision. This ruling the state supreme court has steadily adhered to in all the cases that have followed.

Such persistent relitigation, in the form of the action of ejectment, of the same title, presenting the same questions, would undoubtedly invite the interposition of a court of equity to grant a restraining order of peace and repose. The mere fact that there are different plaintiffs, and different defendants in possession of parts of the same lot, matters not, as they claim under a common source of title, with a community of interest, and the same right of offense and defense. Primm v. Raboteau, 56 Mo. 407. This being so, what is the duty of the federal court, when and where the same action of ejectment is renewed between the same parties or their privies, on the same title and facts substantially presented in the cases so repeatedly adjudicated in the state courts? As in this jurisdiction no equitable defense can be interposed or equitable relief granted on the answer to an action at law, so much of the answer in this case as asks for a restraining order must be disregarded. But the facts pleaded in the answer respecting the prior repeated adjudications in the state court will be regarded, in this jurisdiction, at least. in so far as such rulings of the state court establish a rule of real property in the state, and especially in so far as that ruling involves the construction of the state statutes of local procedure and jurisprudence. For instance, counsel for plaintiffs press upon the consideration of this court the question as to whether Hammond, at the time of the execution sale, in 1823, held any such interest in this land as was seizable and vendible under execution. Their contention, in part, is that a

proper regard to and construction of the territorial and state statutes then in force did not warrant such levy and sale. Indisputably, this was purely a question for the state court, as it presented for determination the construction of its statute laws, the character of property interests liable to seizure and sale under execution, and the interest and rights obtained by the purchaser thereunder. It was insisted there, as here, that the fact that whatever interest Hammond had in the lot in question was derived under what is known as the "New Madrid Location Act of Congress of 1815;" therefore, a federal question was presented, involving the proper construction of said congressional act. It was on that ground, and that alone, these plaintiffs carried the Johnston Case to the United States supreme court, and insisted on a reversal of the decision of the state supreme court. But the United States supreme court held that no federal question was involved; that the decision of the state court was broad enough to support the judgment on independent grounds. So palpably does the federal supreme court mean to say that the mere fact that the interest of Hammond, held by the state court to have been transferred by the execution sale of 1823, may have been derived under a New Madrid location, did not affect the conclusive effect of the decision of the state court, that plaintiff's counsel, in argument at this bar, felt compelled to assert that the United States supreme court erred in holding that the case was not reviewable there. That was not an inadvertent nor inconsiderate opinion. I find from the briefs of counsel that that precise question was pressed at length upon the attention of the United States supreme court, and it was passed upon. While it stands, it is conclusive on this court.

It is sought by plaintiffs' counsel to escape from this dilemma by insisting that Chief Justice Black, of the state supreme court, in his opinion, fell into two fatal errors of fact: First, in holding that at the time of the execution sale, in 1823, Hammond held the lot under a title bond from Easton; and, second, that Hammond had ever thereunder entered into possession of the land. Out of deference to this contention, I have examined carefully into this matter. The deed of date September 29, 1823, from Easton to Hammond, conveying this land, contained this recital: That it was made "in consideration of fifteen hundred and eighty-three dollars to him in hand paid by said Samuel Hammond, and pursuant to the conditions of a certain bond executed by the said Rufus Easton to said Samuel Hammond and James I. Wilkerson, dated September 3, 1819." In addition to which, Easton, on July 10, 1819, conveyed the residue of his interest in this lot to one Stokes. This deed, in the descriptive part, calls for "a stone at the southwest corner of the Samuel Hammond survey; thence east 4,766 links to the southeast corner of said Hammond's survey;" and this, as the evidence shows, is the dividing line between the two portions of the survey, thus showing that Easton had disposed of the tract to Hammond prior thereto.

It is insisted that the reference to the bond is too indefinite and uncertain to predicate the conclusion that it was a title bond for

a sale of the land.  But the language of this recital must be construed with reference to the subject-matter of the writing in which it is made, and the purpose for which it was made.  It being recited in the deed that the indenture was executed "pursuant to the conditions of a certain bond," no other inference is reasonably permissible than that the bond was one, the conditions of which required that the obligor should do precisely what he was doing by the execution of the deed, to wit, to convey to the grantee, by deed, this land, on payment of $1,583; and, although the deed was made alone to Hammond, the presumption is reasonable that, while Hammond and Wilkerson were named as obligees, its condition was that the deed should be made to Hammond alone, as the recital of the deed is that it was made pursuant to the conditions of the bond.  Judge Black says in his opinion there is evidence that Hammond went into possession under his title bond, and remained in possession several years.  This fact is stoutly denied by plaintiffs' counsel.  Their contention is that the spring called "Hammond's Spring," and the cabin or building used by servants of Hammond, were not in fact on the Hammond land, but were outside of it several hundred feet, on what is known as "Conway's Lot."  An examination of the evidence relative to this issue satisfies my mind that Hammond, long prior to 1823, did exercise dominion over this property.  There was a cabin occupied by negroes, the servants of Hammond; and this cabin and the spring were then understood to be on the Hammond lot, and within the lines of the survey of Hammond, as then understood.  While a later survey may have thrown the spring and cabin onto the Conway lot, it is quite inferable that the occupation and use made by said servants extended to and over the Hammond tract; and as the occupation of a part of the tract was under color of title, and that assertion, as generally understood, extending to the right of dominion over the whole, in contemplation of law, amounted to possession of the whole.

The presumption of law, which prefers to refer the act of a party to a lawful rather than a tortious act, is that Hammond was claiming the right of occupancy by virtue of the title bond, as that was his only color of title or right; and, whatever may now be said respecting the abstract legal limitation of the character of the claim of an incipient locator under a New Madrid claim, it is a part of the history—it may be in part unwritten history, yet founded in the traditions of the territory, back of the existence of the state—that such claimants, from the time of their selection of lands made in lieu of their lost or injured homes in New Madrid county, and their designation on the surface of the earth by survey, regarded the selected spot as their home, and at once entered thereon, with assertion of dominion; built houses and fences, and invested it with all the circumstances of habitation.  This fact is rendered especially conspicuous in this case because it appears from the record that, as soon as Easton made his selection, he regarded his interest in the new location so effectual that he conveyed by deed his New Madrid land to the government.  It was

of this condition of affairs in the territorial history of the state that Judge Scott, in Landes v. Perkins, 12 Mo. 259, observed:

"It is a matter of history, of which this court will take judicial notice, that at the time of the cession of Louisiana to the United States, in that portion of the territory of which this state is composed, nineteen-twentieths of the titles to lands were like that involved in this case, prior to its confirmation. There were very few complete grants. Most of the inhabitants were too poor to defray the expenses attending the completion of their titles, but they had faith in their government, and rested as quietly under their inchoate titles as though they had been perfect. Stoddard's Sketches, 245. As early as October, 1804, we find the legislature speaking of freeholders, and authorizing executions against lands and tenements. See law establishing courts for the trial of small causes, passed October, 1804, (section 10.) There being so few complete titles, the legislature, in subjecting lands and tenements generally to execution, must have contemplated a seizure and sale of those incomplete titles which existed under the Spanish government. At the date of the act above referred to, no titles had been confirmed by the United States. An instance is not recollected in which a question has been made as to the liability of such titles as Clamorgan's under the Spanish government to sale under execution. It is believed that such titles have been made the subject of judicial sales, without question, ever since the change of government."

Easton evidently acted on this usage, for he not only made a title bond to Hammond for a deed to part of his inchoate location in 1818, but in 1819 actually conveyed, by warranty deed, the residue of the lot to William Stokes. And it is not too much to say that, in so far as the government could be said to act by its agents in such a matter, the land-office department itself, although the act of 1815 was silent as to transfers and assignments, recognized the act of earthquake sufferers in transferring their right of location, by admitting such transferees to make the selection. And the equities springing from trades between the incipient locator and other parties have been recognized by the courts of the state, and they have been enforced. Landes v. Perkins, supra; Landes v. Brant, 10 How. 348. It is not deemed necessary that I should say more of the liability of such an equity as Hammond acquired under his title bond and possession to seizure and sale under execution, than what is said by the supreme court in the Johnston and Block Cases, above referred to.

From the inception of this litigation to the last syllable of the argument in this case, the proposition has been earnestly pressed that in respect of New Madrid locations no equitable interest whatever could be acquired by the locator in the selected land until the survey thereof is received and entered at the recorder's office, and as that did not occur, in this case, until 1833, there was no equity whatever in 1823, on which an execution sale could operate for any purpose. Lessieur v. Price, 12 How. 59; Rector v. Ashley, 6 Wall. 142; Gibson v. Chouteau, 13 Wall. 92; Shepley v. Cowan, 91 U. S. 330,—are particularly relied upon in support of this contention. It is to be conceded that, looking alone to the language employed in certain portions of these opinions, the conclusion sought to be applied here would find some warrant. But the language of courts must often be restrained to the facts of the particular case, and the objective point in the mind of the judge. Without taking the labor and space to review the facts of these cases, it is sufficient

to say that they involved the question of priority of right between conflicting claimants asserting title to the land under separate sources, each emanating from the government. What the court distinctly sought to emphasize was that, until the final act in the successive stages of acts to be performed on behalf of the locator to complete his right to a patent was performed, the title remained in the government, and, short of the consummative act, the right of the government, in the primary disposal of the public domain, to withdraw the land from the operation of the incipient act of a seeking locator, and divert it to other public use, remained intact, and no act of the claimant, short of a culminative act, could create an equity, as against the government's right to recognize another grantee under it. But, so far as I am able to discover, that court has never held that as between two parties claiming title under the same grantee, after the title has passed from the government, they could not, after the incipient location, as between themselves, make contracts respecting the property enforceable in the courts against each other. On the contrary, the courts, both state and federal, recognize this distinction. In Bush v. Marshall, 6 How. 285, there was a sale of a possessory right to two lots in the town of Dubuque. Of this, the court observed:

"At the time of this transaction the United States had not yet offered the land in which the town of Dubuque was situated for sale; but, notwithstanding the occupants of lots were mere tenants at sufferance only, they proceeded to make valuable improvements, under the expectation of the grant of a right of pre-emption from the government, or, at least, that they could complete their title by purchase from it, when the lots should be offered for sale. These possessions and improvements were treated as valid and subsisting titles by the settlers, and were the subject of contract and sale by conveyances in the forms usual for passing a title in fee."

As expressed by another authority:

"The right of the United States to dispose of her own property is undisputed, and to make rules by which lands of the government may be sold or given away is acknowledged; but, subject to these well-known principles, parties in possession of the soil may make valid contracts, even conceding away the title, predicated upon the hypothesis that they might thereafter lawfully acquire the title, except in cases where congress had imposed restrictions on such contracts."

In Landes v. Brant, 10 How. 348, one Dodier was the grantee of a Spanish concession, which he conveyed to one Clamorgan in 1807, prior to confirmation. One Sarpy, in 1808, recovered judgment against Clamorgan, on which an execution issued, and Clamorgan's interest was sold by sheriff to one McNair. After which, the commissioners, in 1811, confirmed this claim, and a patent thereon issued in 1845 to Clamorgan, or his legal representatives. The debated question before the court was whether the sheriff's sale and deed conveying the equitable interest constituted the purchaser a legal representative of Clamorgan. The court held that the assignee, by bona fide conveyance, came in before a volunteer, such as an heir or devisee. The court said:

"To what description of assignee, then, did the title inure, according to the act of 1836? Necessarily, to one claiming, not the legal, but the equitable, title existing when the patent issued; and in him the legal title is vested

by the patent. The same rule was applied in the case of Stoddard v. Chambers, 2 How. 316."

Further on, the court said:

"In every case when this court has been called on to investigate titles where conveyances of lands had been made during the time that a claim was pending before a board of commissioners, and where the claim was ultimately confirmed in the name of the original claimant, the intermediate assignments have been upheld against the confirmee, and his heirs or devisees, in the same manner as if he had been vested with the legal title at the date of conveyance. We are therefore of opinion that the sheriff's deed made to McNair in 1808 must be supported on this ground, also."

In Levi v. Thompson, 4 How. 17, it was held that a register's certificate of purchase of a lot in the town of Dubuque gave such an equitable estate in the lot, before issue of patent, as would subject the lot to sale under execution, under the laws of Iowa. The contention of counsel in that case was that the legislature of the territory could confer no authority on the sheriff to sell the property, "because the title was yet in the United States, and had not passed to Levi and Thompson at the time of the sheriff's sale."

The opinion of Mr. Justice Field in Shepley v. Cowan, 91 U. S. 330, is quite explicit. It was delivered at the same term of the decision in the Hot Springs Cases, 92 U. S. 698. He referred to the cases of Frisbie v. Whitney, 9 Wall. 187, and the Yosemite Valley Case, 15 Wall. 77, in which it was held that an inchoate right is not such a vested interest as would deprive congress of the power to otherwise dispose of the property. His language is that the occupation and improvements—

"Did not confer upon the settler any right in the land, as against the United States, or impair in any respect the power of congress to dispose of the land in any way it might deem proper."

Further on, the court say:

"But whilst, according to those decisions, no vested right, as against the United States, is acquired until all the prerequisites for the acquisition of the title have been complied with, parties may, as against each other, acquire a right to be preferred by purchase or other acquisition of the land, when the United States have determined to sell or donate the property. In all such cases, the first in time in the commencement of proceedings for the acquisition of the title, when the same are regularly followed up, are deemed to be the first in right."

After asserting that the bare settlement is the initiatory step in the acquisition of title, the court further says:

"The party who takes this step, if followed up to a patent, is deemed to have acquired the better right, as against others, to the premises. The patent which is afterwards issued relates back to the date of the initiatory act, and cuts off all intervening claimants." See Landes v. Perkins, 12 Mo. 254.

I am unable to perceive why the doctrine of relation should not apply to this case. That doctrine, succinctly stated, is as follows:

"Where there are divers acts concurrent to make a conveyance, estate, or other thing, the original act shall be preferred, and to this the other acts shall have relation."

The case of Stoddard v. Chambers, 2 How. 316, which definitely settled the title to a considerable portion of the city of St. Louis, quite aptly illustrates the application of this rule. Bell had a

Spanish concession, which he conveyed in 1804, by quitclaim, to Mackey, who conveyed, by quitclaim, in 1805, to Stoddard, whose heirs were the plaintiffs. This claim, in 1836, was confirmed to Bell and his legal representatives. It was held that the legal title related back so as to cover the quitclaim deeds, and inured to Stoddard and his heirs.

What was the initiatory step in this Hunot Case? The supreme court, in the Hot Springs Cases, declares it to be:

"Application to the recorder of land titles, showing parties' claim, and praying for a certificate of location; certificate of location issued by the recorder, setting forth the amount of land to which the applicant is entitled; application to the surveyor, presenting the certificate of location, and designating the lands which the party desires to appropriate; survey and plat made by the surveyor; return of the survey and plat to the recorder to be filed and recorded, with a notice designating the tract located and the name of the claimant; certificate of the recorder, stating the facts, and that the party is entitled to a patent; transmission of this certificate to the general land office; the patent."

The first four of these successive steps were taken as early as 1819. Unquestionably, the title of Hammond relates back to that date, and anterior to the date of the execution sale.

But, say counsel, this principle has no application to the instance of an execution sale, in a case like this; that a sheriff's deed operates only as a quitclaim, and does not reach out to an after-acquired legal title to the fee, even where the execution debtor had an equitable interest. The decisions of the courts are otherwise. In Porter v. Mariner, 50 Mo. 364, the court says:

"A sheriff's deed relates back to the sale, as to the defendant in the execution, and his privies, and as to strangers purchasing with notice, and vests the title in the execution purchaser from that time."

So, in Callahan v. Davis, 90 Mo. 78, 2 S. W. 216, it is said:

"It will be seen that Thompson conveyed the land to Turpin by quitclaim deed after he had entered it, and before he received the patent, and the contention is that this deed did not convey the after-acquired title, so that Turpin only got an equity, and that the plaintiff cannot maintain this suit at law on that title. Thompson, by his certificate of entry, got an imperfect title,—one upon which, by the laws of this state, he could have maintained an action of ejectment for the land against any person not having a better title. The patent, when issued, made that imperfect title a perfect legal one. The entry and the patent were all several acts necessary to make a complete title, and are to have relation back to the act which created the equitable title."

In Massey v. Papin, 24 How. 362, the court says:

"Intermediate conveyances made by one who has taken incipient steps to procure title will be covered by the legal title, when obtained, and will pass such title to the alienee, against the grantee and his heirs, and against his assigns with notice; and this doctrine equally applies whether such intermediate conveyances are made by act of the grantee himself, or by the sheriff under execution." See, also, Landes v. Brant, 10 How. 374; Choteau v. U. S., 9 Pet. 147.

It is inconceivable to my mind how the plaintiffs can deny to the defendants the benefit of the doctrine of relation, while they themselves, in this action, are compelled to invoke it to assert title under the patent. It is to be observed that the two conveyances

by the government—first, the headright, or original concession, and the New Madrid location—are referred to Joseph Hunot as the original owner. The confirmation of the grant in New Madrid county was made by Act Cong. April 29, 1816. It was not to Easton, but to Hunot; and it was in lieu of the Spanish grant to Hunot that the government gave its consent to Hunot to make the New Madrid location of the land in question. As the conveyance predicated of the proceedings culminated in the patent of 1859, it devolved upon the plaintiffs to show that those claiming under the patent held lands which were destroyed or injured by the earthquakes in New Madrid county. Hence, in developing their case, they introduced in evidence the concession under the Spanish government to Hunot, and the application in 1811 to the board of commissioners to confirm his concession, and the report of Recorder Bates in 1815, recommending the claim for confirmation. This confirmation dated April 29, 1816, in evidence, was made to Hunot, and not to Easton. They read in evidence the recorder's certificate of August 12, 1816, to Hunot, or his legal representatives, reciting that the certificate was in lieu of the lands injured by the earthquake. Next, they put in evidence the application made by Brown for Easton, June 16, 1818, to the surveyor general, to locate said certificate on the lands in question. Next, the survey returned by the deputy surveyor June 23, 1819, to the surveyor general's office, and the return of this survey to the recorder January 8, 1833. And it was on these proceedings the patent was issued August 30, 1859, to Hunot or his legal representatives, thus showing the legal title in Hunot. And while the patent may be said to inure to the benefit of the owner of the injured land, yet, but for the Spanish concession to the New Madrid land, there could have been no New Madrid location. Easton, owning the New Madrid land when the exchange occurred, became, pro hac vice, the owner of the new located land. These were all dependent proceedings on each other, essential to a completed title, and became operative by virtue of the doctrine of relation. The maxim may therefore fitly be applied to the attitude of the plaintiffs, "Qui approbat non reprobat." He may not both accept and reject the same thing.

This coincidence of situation as to the common source of title illustrates the application of the doctrine of relation to this case, as distinguishable from the principle of the authorities cited by plaintiffs. This presents a case where the parties are claiming title to land after the fee has passed out of the government by patent. They are not claiming the land under conflicting concessions under Spanish grants, nor under conflicting locations under the New Madrid act; but both parties assert title under the same patent, which has its inception in the same location under a New Madrid claim. I am therefore utterly unable to grasp the refinement which would exempt a claim thus situated from the operation of the rule laid down in Ross v. Barland, 1 Pet. 655, that in an action of ejectment the courts look beyond the consummative act essential to the appropriation of the land, "from its incipient state, whether by warrant, survey, entry, or certificate, until its final con-

summation by grant," and that the grant, when made, shall relate back to the inceptive act, which, as between plaintiffs and defendants in this case, is the survey and certificate. This being a rule to work out an equity in an action at law in ejectment, it does seem to me it should have place in this case. From the time Hammond's interest in this land was sold under execution, in 1823, he abandoned it to the purchasers, and quit the state. In an insolvent proceeding thereafter, he obtained his discharge, after furnishing a schedule of his property, and conveying all he owned to the United States. He did not include therein this land, thereby solemnly declaring that he made no claim thereto. For nearly 50 years thereafter, until his heirs were hunted up and incited to this litigation, the purchaser at said execution sale, and those claiming under him, through whom plaintiffs claim, remained in the undisputed possession, under open claim of ownership to this land, at least since 1830. In such a case, if there be a single weapon in the whole armory of justice to beat off assaults upon such occupants, it ought to be employed by a court of justice.

I have not considered the plea of the statute of limitation interposed in the answer, as, under the conclusions reached on the other questions of fact and law, the plaintiffs' action must fail. Nor do I pass upon the other important and interesting question raised by the defense, that the lot in question was reserved by the government, and was not subject to location under the New Madrid act of 1815, under claim that it was granted as part of the commons to the village of St. Louis for public school purposes, which title Peter Lindell, under whom defendants deraign by purchase, is alleged to have acquired. As the plaintiffs claim title under Hammond, if that title be in the defendants this action of ejectment is defeated.

There is, however, another question presented by the pleadings and the evidence which the court should dispose of. The jurisdiction of this court in this case depends upon the diverse citizenship of the parties. The plaintiffs claim to be nonresidents of this state. The answer denies this allegation of the petition. The counsel for plaintiffs objected at the hearing to the consideration of this issue of fact, on the ground that the issue was not interposed primarily by plea in abatement. But it is the settled rule of practice, under the state Code, that such a plea may be conjoined with other matters of defense to the action, as the Code contemplates but one answer. Little v. Harrington, 71 Mo. 390; Byler v. Jones, 79 Mo. 261. And the rules of pleading in actions at law which obtain in the state are followed in this jurisdiction. But if this were not so, since the judiciary act of 1875, it would be the duty of this court, at any stage of the proceedings, whenever the fact appeared —whether in the pleadings or in the evidence—that jurisdiction over the parties does not exist, or is fraudulently sought by the plaintiffs or plaintiff, to summarily dismiss the action, at least as to the party wrongfully in court. Morris v. Gilmer, 129 U. S. 315, 9 Sup. Ct. 289; Anderson v. Watt, 138 U. S. 694, 11 Sup. Ct. 449; Railroad Co. v. Swan, 111 U. S. 379, 4 Sup. Ct. 510. The plaintiff Ed. C. Smith was introduced as a witness in his own behalf, and it ap-

peared from his testimony that prior to January 1, 1893, he was a citizen of the state of Missouri, residing in the city of St. Louis; that he had so resided there 19 or 20 years prior thereto; that after the decisions heretofore mentioned, in the supreme court of this state, and on the 1st day of January, 1893, he claims to have acquired a residence in the state of Illinois. His evidence was that he went over to East St. Louis, which connects with the city of St. Louis by bridge, and rented a room, in which, as a rule, he slept at nights. He did not change his business office in the city of St. Louis, but has ever since retained the same, and done business in the city of St. Louis as theretofore. That he took his meals, breakfast, lunch, and dinner in the city of St. Louis. He has no property in Illinois, nor is he engaged in any business there. He was scarcely able to give the number of the room in which he slept. In answer to the direct question, "What was your purpose in going to East St. Louis?" he said he went there so he could use the federal courts, and that he went there for the purpose of bringing this suit in the federal court, and such other suits as he might desire to bring.

This presents a much stronger case against a feigned attempt to acquire a residence than that of Morris v. Gilmer, supra, in which the supreme court held that the plaintiff's action should have been summarily dismissed. It is not denied that a person may move out of the state, into another state, for the purpose of acquiring a new residence, to enable him to bring suit in a federal court of the state from which he removes; but the change must be bona fide,—"a real animo manendi, and not merely ostensible." In other words, the act of removal out of the state must be accompanied with an actual intention of acquiring a permanent residence at the new domicile for an indefinite and uncertain time. The plaintiff's unqualified answer, with the other facts and circumstances in evidence, leave no possible reasonable doubt but that this is a mere pretended and temporary change of residence, if in fact it was a change at all.

The action as to this plaintiff must therefore be dismissed.

On the facts of this case, the law is that plaintiffs cannot recover.